PATRICK FITZGERALD

*v.*

STATE MUTUAL BUILDING AND LOAN ASSOCIATION.

[Decided May 9th, 1909.]

1. In the distribution of assets among the stockholders of an insolvent building and loan association neither the owners of stock known as "full paid stock" nor owners of stock known as "advance payment stock" are entitled to preferment as such.

2. Nothing either in the statute or by-laws contemplates that such stock shall become preferred stock in the sense that such stock shall be entitled to preferment in the distribution of assets at dissolution, or that its holders shall become general creditors of the association as distinguished from stockholder members.

3. Neither are the holders of stock on which notices' of withdrawal have been given entitled to preferment in such case.

4. The only equitable plan for distribution of the assets of such association is the *pro rata* division of the assets among all of the stockholders, giving to each share of stock a value, for purposes of distribution, of the amount paid on it.

Mr. *Thomas E. French,* Mr. *Samuel K. Robbins* and Mr. *George J. Bergen,* for the receivers *pro se.*

Mr. *Harvey F. Carr,* for sundry stockholders.

Mr. *Ralph E. Lum,* for sundry stockholders.

LEAMING, V. C.

The receivers of defendant building and loan association now desire to make a partial distribution of assets among the stockholders of the insolvent association, and to that end have brought in all parties in interest that it may be determined, among other things, whether certain stockholders are entitled to preferment in the distribution of assets. As the assets of the association will be insufficient to pay the full amount paid in by its members,

it becomes necessary to ascertain whether certain stock is entitled to priority of payment over other stock. The present contest arises by reason of the claim of preferment made by the owners of stock who gave notice of withdrawal before the suspension of the business of the association, and also a like claim made by owners of certain stock known as "full paid stock" and certain other stock on which "advance payments" have been made. The advance payments are authorized by section 7 of the constitution of the association, which section permits any stockholder to pay in advance money on account of his installments of dues and entitles the person so paying to receive a certain discount for the advance payments. The "full paid stock" is authorized by section 8 of the constitution. That section authorizes a stockholder to pay $100 per share for his stock and entitles the person so paying to receive a certain rate of interest on the amount paid until the stock of that series matures. The right of withdrawal is conferred by section 9 of the constitution and the terms of withdrawal are set forth in article 4 of the by-laws, and in sections 38 and 39 of an act of the legislature approved April 8th, 1903. *P. L. 1903 p. 457.* Of the full paid stock there are nine hundred and forty-five shares; of these, thirty-eight owners of one hundred and twenty-eight shares have given notice of withdrawal and two hundred and twenty-six owners of the remaining eight hundred and seventeen shares have not. Of the "advance payment stock" there are ten thousand one hundred and forty-one shares. Of these, two hundred and ninety-six owners of five thousand three hundred and five shares have given notice of withdrawal, and eight hundred and sixty-seven owners of the remaining four thousand eight hundred and thirty-six shares have not. Of the remaining stock of the association, that is, stock on which no advance payments have been made, there are seventeen thousand and fifteen and one-half shares. Of these, eight hundred and eighteen owners of two thousand one hundred and nine shares have given notice of withdrawal, and two thousand three hundred and sixty-seven owners of the remaining fourteen thousand nine hundred and six and one-half shares have not. The evidence discloses that some time prior to two years before the suspension of busi-

ness the association began to receive a great number of withdrawal notices and that the withdrawals continued thereafter in such numbers that during the two years prior to suspension loans on real estate security were practically discontinued. During that period but three loans were made on real estate security: one in April, 1905, for $1,600; one in July, 1905, for $1,000, and one in August, 1905, for $250. The only loans made during that period, except as above stated, were what was known as "stock loans;" these are described as loans to members exercising the right to borrow ninety per cent. of the withdrawal value of their stock by pledging their stock as security. Many members borrowed in this manner because they could not procure their money by withdrawal without waiting a long time. During the two years referred to the withdrawal notices accumulated until at the date of suspension the withdrawal notices unpaid amounted in the aggregate to $232,143.88. Payments on withdrawal notices were made in the order in which the notices were filed and at the date of suspension applications for withdrawals to the amount of $172,779.22 had been on file more than six months. At the hearing an examination was also made of the assets and liabilities of the association as of the date of its annual statement about two years before its suspension of business. If the testimony of the receivers as to the value of the real estate can be regarded as reasonably accurate, the value of the assets of the association two years prior to its suspension had become less than the amount at that time paid in by its members.

There appears to be no reasonable ground for the contention that either the "full paid stock" or the "advance payment stock" is entitled to preferment as such. Only one kind of stock is contemplated by the charter act or by-laws. The provisions above referred to touching full paid stock and advance payments of dues are mere privileges given alike to all stockholders. Such payments are payments on stock, and in no sense loans to the association. The consideration for the advance payments of dues and for the full payments on stock passes at the time of payment to the same extent as all other payments on stock. Nothing in either the statute or by-laws contemplates that the stock so issued shall become preferred stock in the sense that

such stock shall be entitled to preferment in the distribution of assets at dissolution or that its holders shall become general creditors of the association as distinguished from stockholder members. The decisions of the courts appear to be practically uniform in the adoption of this view. *People* v. *New York B. & L. Ass'n*, 110 N. Y. App. Div. 554; *People* v. *Metropolitan Mut. B. & L. Ass'n*, 103 N. Y. App. Div. 153; *Forwood* v. *Eubank (Ky. App.)*, 50 S. W. Rep. 255; *Solomons* v. *Am. B. & L. Ass'n*, 116 Fed. Rep. 676; *Hohenshell* v. *Home B. & L. Ass'n*, 140 Mo. 566; *Leahy* v. *National B. & L. Ass'n*, 100 Wis. 555. Furthermore, the Building and Loan Association act of 1903 (*P. L. 1903 p. 457*) expressly forbids the issuance of preferred stock. Section 53 of that act provides as follows:

"No such association (building and loan association) shall issue preferred stock or other than common stock, and all shareholders shall occupy the same relative status as to debts and losses of the association."

It also seems entirely clear that no claim of preferment upon the part of stockholders who have given notice of withdrawal can be sustained, so far as such claim is based upon the provision of the by-laws touching withdrawals. The by-laws provide that "at no time shall the association be required to pay out on withdrawals more than one-half of the monthly receipts of dues." The evidence discloses that in every month during the last two years of the life of the association more than one-half of the dues were paid for withdrawals, and in almost every month the amount paid for cash withdrawals exceeded the amount received for dues, and this is also true even when advance payments on stock and payments for full paid stock are treated as dues of the month in which such payments were received. The aggregate amount received during the two years named for dues, including advance payments and payments for full paid stock, was $342,-447.72, whereas the amount paid for cash withdrawals during the same period was $442,368.07. These payments were made on withdrawal notices in the order of their dates. It thus appears that at the time of dissolution no payment was due under the terms of the by-laws on any withdrawal notice. It has, I think, been uniformly held that the right of withdrawal does not exist

except as conferred by a by-law or statute, and when so conferred the right will be restricted to the terms of the by-laws or statute. *Miers* v. *Columbia Mut. B. & L. Ass'n, 157 Fed. Rep. 940; Rabbitt* v. *Wilcoxen, 103 Iowa 35; Heinbokel* v. *National S. L. & B. Ass'n, 58 Minn. 340.*

But in the year 1903 a general act was passed touching building and loan associations. *P. L. 1903 p. 457.* Sections 38 and 39 of that act relate to the subject of withdrawals. The latter section provides:

"Withdrawals shall be paid in the order in which the notices thereof are received, but not more than one-half the receipts of any one month shall be required to be used for payment of withdrawal claims, without the consent of the board of directors, until the oldest of such claims then unpaid shall have been on file for a period of six months; but in no case shall payment be postponed for a period longer than six months from the date of such notice, and any shareholder who has given the said notice may sue for and recover the withdrawal value of his shares in any such association in any court of competent jurisdiction, if the same is not paid in six months from the date of the giving of said notice of withdrawal."

As already stated a part of the withdrawal notices in question had been on file over six months at the time of suspension, while others had not. It is not easy to determine what this statute may contemplate by the use of the word "receipts." The inquiry, however, does not appear to be material, because the statute requires all notices on file six months to be paid irrespective of the amount of receipts, and the notices on file less than six months would not have been reached had one-half of all receipts from all sources, including dues, interest, premiums, fines, advance payments on stock, moneys received for full paid stock and loans repaid to the association been applied to the payment of the withdrawal notices. More than one-half of the moneys received from all sources was, in fact, applied to the payment of withdrawals, although it does not appear that any resolution was adopted by the board of directors consenting thereto. As none of the notices of withdrawals which had been on file less than six months were payable either under the terms of the by-laws or the terms of the statute, it follows, as is shown by the cases last above cited. that they cannot be regarded as preferred claims.

The only doubt which I entertain is touching rights which may have arisen under notices which had been on file over six months at the date of suspension; but independently of the considerations already stated, I am convinced that neither the claim based on notices filed less than six months nor those based on notices filed more than six months can be now properly treated as entitled to preferment in the distribution of assets. There may be some question as to whether the statute of 1903 can be regarded as superseding the by-laws so far as the rights of stockholders prior to that date are concerned, for rights accruing under the by-laws partake of the nature of contractual rights between the several members; but I think the conclusion just stated must be reached even though the statute be regarded as controlling as to all stockholders. As already stated the right of a stockholder to "withdraw" by surrendering his shares and withdrawing money in lieu of them and in that manner to terminate his membership, is derived from the by-laws of an association, or from a statute if the subject is controlled by statute. In either case the rights, privileges and liabilities flowing from the proceeding must be ascertained from the by-law or statute controlling the subject. The question is therefore essentially one of statutory construction. The English decisions construe a by-law or rule which confers the right of withdrawal with peculiar strictness, and while they recognize that the notice of withdrawal does not terminate the membership of the stockholder giving notice nor constitute him a creditor of the society in an unrestricted sense, yet they treat his claim as entitled to preferment at dissolution. See *Walton* v. *Edge, 10 App. Cas. 33; Sibun* v. *Pearce (1890), 44 Ch. Div. 354; In re Sunderland Society (1890), 24 Q. B. Div. 394; In re Ambition Building Society (1896), 1 Ch. 89.* The *Sunderland Case,* however, gives recognition to the rule of construction that the by-law or statute conferring the right of withdrawal may not contemplate the exercise of the right except while the society "was or was believed to be" still solvent. While the decisions in this country cannot be said to be uniform, the view appears to be generally adopted that upon the distribution by a court of equity of the assets of an insolvent building association among its stockholders the by-laws or

statute which confers the right of withdrawal will be understood
to have reference to the general mutual and equitable scheme of
such association and to presuppose that at least a relative propor-
tion of the assets will remain for the benefit of those who continue
to be active members of the association. In this view it is held
that notices of withdrawal which have matured after the associa-
tion has reached an insolvent condition are not entitled to pre-
ferment of payment at dissolution. Some of the decisions go
even further, and hold that independently of the fact of insol-
vency at the time a withdrawal notice is given or matures, the
basis of distribution is not the rule of the association expressed
in a by-law or statute, standing alone, but the supreme rule of
equality and mutuality. The following are among the cases
adopting the views stated: *Reddick* v. *United States Building
and Loan Association, 100 Ky. 94; Christian's Appeal, 102
Pa. St. 184; Walker* v. *Terry (Ala.), 35 So. Rep. 466; Rabbitt*
v. *Wilcoxen, 103 Iowa 35; Hohenshell* v. *Home Savings Asso-
ciation, 140 Mo. 566; Reitz* v. *Hayward, 100 Mo. App. 216;
Fort Smith Building Association* v. *Cohn, 75 Ark. 497; Alex-
ander* v. *Southern Home Building and Loan Association, 110
Fed. Rep. 267; Coltrane* v. *Baltimore Building and Loan Asso-
ciation, 110 Fed. Rep. 272; Colin* v. *Wellford, 102 Va. 581;
Manheimer* v. *Henderson Building and Loan Association (Ky.),
72 S. W. Rep. 313.* See, also, *6 Cyc. 165; End. Build. Asso.
(2d ed.) §§ 108, 514, 515.*

The General Building and Loan Association act of 1903, of
which the sections already referred to touching withdrawals
form a part, will be found to contemplate throughout its pro-
visions the central idea of co-operation, equality and mutuality
upon the part of the members of the association. That part of
section 53, already quoted, which provides that "all shareholders
shall occupy the same relative status as to debts and losses
of the association" is but in harmony with the general plan of the
act. The general plan of the act being as stated, I am unable
to believe that sections 38 and 39, relating to withdrawals, were
intended by the legislature to be applicable to associations which
should have reached an insolvent condition. I entertain the view

expressed in the *Coltraine Case,* already cited, that these provisions touching withdrawals, like the other provisions of the act, are obviously intended and are equitably applicable only so long as the association is a going concern from which all the members may ultimately hope and expect to receive approximately equal benefits. In the ascertainment of the legislative intent, I do not think it proper to ignore the obvious fact that if the sections referred to are held to apply to insolvent associations and to entitle its withdrawing members to be paid in the order in which their notices of withdrawal are given, the practical result will inevitably be to afford a means of preferment for those who are in the best position to know the true condition of the association to the exclusion of the poor and ignorant. I do not think that such a plan can be reasonably said to have been within the contemplation of the legislature. It is true that the act gives to a withdrawing member, whose notice of withdrawal has been on file over six months, a right of action for the "withdrawal value of his shares." But the statute does not contemplate that the withdrawal value of shares can in any case exceed the proportionate part of the assets of the association represented by the shares. That amount the receivers are willing to pay when the assets are reduced to cash, first deducting the cost incident to reducing the assets to cash. But the holders of stock on which notices of withdrawal have been given demand full payment in the order in which the notices have been filed. What amount they demand is not by them specified. The testimony touching the assets of the association discloses with reasonable certainty that no share of stock now in question would have been entitled, at the date of the notice given for its withdrawal, or at any subsequent date, to receive the full amount paid in on it, had there been applied to the share the full proportionate part of the assets of the association. The statute says:

"If the withdrawal be made within the first year, the withdrawal value of the shares withdrawn shall be not less than the sum of the subscriptions or dues paid on such shares, less all unpaid fines and a proportionate share of any loss sustained by the association; after the first year, a reasonable share of the profits shall be included in the withdrawal value and shall be paid to the withdrawing shareholder."

Whether the provision for payment "after the first year" also contemplates deduction of a proportionate share of the losses is not clear, but I apprehend the meaning to be that if stock is withdrawn during its first year it shall not share in the profits, but may do so if later withdrawn, and that all withdrawn stock shall bear its share of losses. Assuming that to be the meaning of the statute, I doubt whether it is possible to now ascertain the withdrawal value of the several shares of stock of which notice of withdrawal has been given, if they are to be treated as preferred and are to be paid in the amount of their withdrawal value in the order in which notices of withdrawal has been given. As already shown, more than one-third of the entire stock of the association, which is owned by about one-third of its members, is under notices of withdrawal. In my judgment, the only equitable plan for distribution of the assets of the association is the *pro rata* division of the assets among all of the stockholders, giving to each share of stock a value, for purposes of distribution, of the amount paid upon it.

The status of a withdrawal notice at dissolution appears to be an open question in this state. In *Silvers* v. *Merchants Saving Fund and Building Association, 56 Atl. Rep. 294* (not officially reported), Vice-Chancellor Grey gave to a withdrawal notice the effect of constituting the owners of the stock a general creditor of the association and entitling him to preferment at final distribution by a receiver in insolvency. In the later case of *Whitehead* v. *Commonwealth Building and Loan Association* (file number, 25-302), Vice-Chancellor Pitney reached the contrary conclusion. No opinion was filed by the learned vice-chancellor in the case last referred to, but I am informed that his decision was reached after a full argument and careful review of the adjudicated cases, including the *Silvers Case* above referred to. I know of no other case in this state in which the court has been called upon to determine the status of withdrawal notices in the distribution of assets among stockholders.

My conclusion is that the statutory right of a member of a building and loan association to withdraw from membership and to receive the withdrawal value of his shares and the statutory

privilege to sue for the amount if it is not paid within the time named in the statute, is based upon and forms a part of the general plan that each member is entitled to equal participation in the assets, and that the statute does not contemplate that the privileges named shall be exercised to defeat equal participation, and that the spirit of the statute being equal participation, the paramount equity is equal participation at all times; and when the association has reached a condition in which the value of its assets is less than the amount which has been contributed by its members as dues, the equitable right of equal participation cannot be defeated by a course of management which will bestow upon withdrawing members, by an artificial and erroneous assumption of withdrawal values, an unequal share of the assets. As no losses are shown to have been sustained during the period between the date of the oldest withdrawal notice now on file and the date of suspension of business, except such losses as may have arisen by the payment to prior withdrawing members of more than their equal share, the present claimants under withdrawal notices, if now treated the same as other members, will receive, with the exception noted, substantially the same amount that they would have received had the suspension of business occurred at the date of the oldest notice.

I will advise a decree of equal distribution.