GRONE

*v.*

ECONOMIC LIFE INS. CO.

(Court of Chancery of Delaware. May 4, 1911.)

*Herbert H. Ward* and *William W. Porter,* for receivers. *Horace G. Eastburn, Christopher L. Ward,* and *Louis M. Rosenbluth,* for exceptants Norton and others.

THE CHANCELLOR: The exceptions of E. S. Norton and 20 other claimants, filed by their solicitors, Horace G. Eastburn, Esq., of Roy Higgins and Rose Bogatzy, filed by their solicitor, Christopher L. Ward, Esq., and of Thomas J. Hemmeler, filed by his solicitor, Louis M. Rosenbluth, Esq., of New York, will be considered and decided together, as they all belong to the same class of claimants against the fund in hand for distribution. All of the claimants are stockholders of the company who severally subscribed for shares of stock of the company, at varying prices per share, all at more than the par value thereof, and with varying terms as to the method of paying therefor and the application of payments as made. While the terms varied slightly, they were substantially similar. Each person subscribed for a definite number of shares at a fixed price, the price ranging from $15 to $24 per share, par being $10. A portion of the price was paid in cash and the balance was made payable without further notice in a fixed number of installments of fixed

amounts, but none of the contracts fixed the interval of time to elapse between installments. Upon payment of the full amount of the subscription price the subscribers were to have a full-paid, non-assessable certificate. It was agreed that the installments so paid to the extent of the excess of the subscription price per share above par should "be first credited as received, to the company's contingent fund, which fund shall be transferred to the permanent surplus fund of the company at the discretion of the board of directors, after deducting therefrom such amounts as it may be necessary to expend in extending and maintaining the company's business, so that the remaining $10 per share may be credited to the capital account without deduction." A sample of the contracts is found in the master's report. The master was right in treating all subscriptions alike, though there were errors therein, evidently either clerical or resulting from inaccuracies of calculation.

All of these exceptants are named in schedule L of the master's report, which includes several hundred other persons. None of them have paid all the installments due, and are therefore in the class of subscribers whose stock is only partly paid for. Some of them have made sufficient payments to cover the excess above par of their stock and a portion of the par thereof. Class 1. Others have made no payments on account of the par value of their stock, inasmuch as their part payments have not exceeded the excess price of said stock above the par value thereof. Class 2. The company in fact carried to the contingent fund all the moneys received from subscribers in excess of the par value until the whole of the excess was paid, and only credited to the par value of the stock the moneys paid in excess of par.

The master found that none of the exceptants and none of those other subscribers in like position were creditors; that those in class 1 above were neither creditors nor stockholders, having made no payments on their stock, but that all had contributed to the contingent fund; and that those in class 2 above were to be treated as stockholders only to the extent that their payments exceeded the price agreed to be paid over par. The exceptants claim that the amount of each installment as received should have been separated into two

parts, one to be credited to the contingent fund and the other to the capital stock, and each subscriber credited accordingly.

The contentions may be thus illustrated. The exceptions claim that if there were such a subscription for 60 shares at $15 per share, calling for a total payment of $900, and if the first payment and each of the subsequent 9 installments should be $90, such $90 should be applied at once to the full payment of 6 shares at $15 per share, thus resulting in carrying to the capital account $60 and the crediting to the company's contingent fund, which should be carried to the permanent surplus fund of the company, the sum of $30; the transaction thus resulting in the stock subscriber being the owner of full-paid stock to the extent of 6 shares.

On the other hand, it was found by the master, as contended in behalf of the receivers, that assuming there was a subscription under this contract to 60 shares of the capital stock at $15 per share, thus calling for a total payment of $900 for such 60 shares, the installments when so paid to the extent of $300 would be first credited to the contingent fund, and none of such installments would be applied to the capital account until such payments exceeded said $300, whereupon the subsequent payments would be applicable to the par of the stock. Under the master's construction of the contract, none of the $60 of the first payment would be credited on account of the par of the stock, but all would be applied to the contingent fund.

Assuming in each case that $600 had been paid in in installments, under the exceptant's construction of the contract, the subscriber who had partly paid up would be entitled to 40 shares of full-paid capital stock, $400, part of the $600, having been applied to the capital account and $200 to the contingent fund account. Under the master's construction of the contract, in like case, $300 would have been applied and transferred to the surplus fund of the company, and $300 would have been applied on account of the capital account. If the subscriber thereupon ceased to pay because of the fault of the company, the stock subscriber would equitably be entitled to 30 shares of stock which his remaining $300 had paid for.

■■ There are no precedents to guide this court, and the principles of law applicable thereto are not of much service. The contention of the exceptants that the contracts were all ultra vires because the subscriptions were at prices above par and because it was an attempt in that way to increase the par value of the stock is untenable. The contracts are valid and the rights of the exceptants and those in like position are based thereon, and there is no real ambiguity in their terms. The master rightly found that the installments so paid to the extent of the excess above par on the entire subscription must first be credited as received to the company's contingent fund and nothing credited thereunder to the capital fund until the full extent of the excess above par on all the shares subscribed for shall be paid, and only the last remaining $10 per share when paid should be credited to the par value of the shares. By the terms of his subscription each prospective stockholder must first pay the entire premium to the company before he was entitled to have applied to his shares any money paid by him, and was not entitled to receive a certificate for his shares until he had paid in full both premium and par value. This seems clear beyond question.

If all the persons who had subscribed for the stock of the company had belonged to either of the classes herein referred to, then it might justly have been held that they were all to be on the same basis, not as creditors or stockholders, but as joint adventurers in an unsuccessful enterprise, which had failed of its purpose, and as no one of them was responsible for the failure, or in default (so far as it appears from the testimony) in not completing their payments in full, either before or since the dissolution of the company, that they should share proportionately according to the amounts paid in the fund now for distribution, to which each contributed. In such a situation equality would be equity, meaning in this case equality of participation in the distribution of a fund in proportion to the contributions to it.

■ But there are several hundred other persons who were subscribers to the company and not included in schedule L, and not in the same relation to the company as the exceptants. These other persons subscribed and paid in full for their shares, the terms of

their subscriptions as to price and terms of payment being unknown so far as appears in the record. They must be treated otherwise than the exceptants are, having fully performed their contracts, and cannot be put on the same basis with those who have not fully performed, whether failure to fully perform be their misfortune or fault. All the subscribers, those who have paid in full and those who have not, embarked in the same undertaking and enterprise. The contingent fund was a method of providing an insurance company with money to be expended in extending and maintaining the business of the company without impairing the capital. This fund was especially useful to a company engaged in insuring lives. Thereby also the company would perhaps obtain that thing so much desired by financial institutions, a permanent surplus fund, if the directors found it wise to make that use of the premiums rather than spend them in enlarging the business of the company. All those who ventured into the plans of the corporation have lost. All have lost the premiums paid by them, much or little. To say that those stockholders who have paid in full their contracts should, because thereof, be put either into the same class as, or in the class behind those who have only part paid, is wholly inequitable. Some subscribers will, it is true, receive nothing. But that a subscriber who has only partly paid up should wholly lose his money paid in on account of the premium above par is no more unfair than that a full paid stockholder should entirely lose the amount of premiums above par which he has paid in. It is equal justice then that stockholders who have fully paid should share proportionately with those who have paid part of the par of their stock, the latter to the extent only that they have so paid on the par of their shares.

■ The exceptants and all other subscribers in like case are not creditors, for by their subscriptions they assumed the relation of stockholders, with some of their rights curtailed until they should have paid in full all the installments of money due on their shares, and then only were they entitled to have certificates for their shares of stock. This relationship is not changed by the dissolution. If stockholders are not creditors then they participate to the extent that they are entitled to stock. Those whose payments do not exceed the

premium were not at the dissolution entitled to receive shares or fractions of shares and have done nothing since the dissolution to so entitle them. Those whose payments exceeded the premium which they agreed to pay are to the extent of their payments in excess of such premiums entitled to shares or parts of shares though they have not paid in full and to the extent of their payments on account of par are entitled to shares. The method of the calculation the master has made in schedule L is therefore approved.

■ All the exceptants and those other stockholders in like position should be treated alike, though they have performed their contracts in various proportions; that is, some have paid a much greater proportion of the amounts payable by them than others have, and some have made payments within shorter intervals than others, and some have failed to make any payments for periods of time much longer than others, some having made no payments for more than three years prior to the dissolution. But inasmuch as the contracts do not fix a time or times within which the installments are due, and in view of the absence of testimony as to the demands for payment, reasons for delay in payment and like matters, it cannot be held that any one or more of the subscribers who have not paid in full their subscriptions are thereby and therefore in legal default. If none are known or proved to be in default either in fact or by the terms of the contract, then all must be treated alike in the distribution.

The exceptions of all the exceptants are disallowed and the report of the master in respect to the claims is approved and confirmed. No subscriber whose payments in the aggregate did not exceed the premium which by the contract he agreed to pay shall receive any portion of the fund for distribution. Every subscriber whose payments in the aggregate exceeded the premium which by the contract he agreed to pay shall receive from the fund for distribution a sum proportionate to the amount paid in excess of the premium, which is to be treated as payments on account of his stock.

(2) Exceptions on behalf of Frank W. Springer, whose claim covered the price paid for the stock owned by him, on the ground that he was induced to purchase the same by false representations.

Frank W. Springer, in December, 1908, subscribed and paid for 50 shares of stock of the defendant company at $23 per share, and filed a claim as a creditor for the full amount paid therefor, basing his right to file such claim on the ground that he was induced to purchase said stock by false representations of one Conway Mc-Millan. The testimony of Springer shows that he and McMillan have been friendly for nearly 20 years; that they were members of the faculty of an educational institution in the Middle West for several years, and have been more or less closely associated socially; that McMillan entered the employ of the defendant company to solicit subscribers to its stock, and, acting in that capacity, he stated that the investment was better than bank stock; that it was absolutely safe; and that it was impossible to lose $500, because it was secure to the extent of $10 a share by the law under which the company was incorporated; that owing to the friendship existing between him and McMillan, and their past business and social relations, he had confidence in McMillan's statements; and that because of such confidence in McMillan's statements he became a subscriber to the stock. The record shows that Springer held the stock from the time he received the certificate to the time he filed the claim; that he voted said stock by proxy at a stockholder's meeting held in May, 1909, at which meeting the stockholders decided to dissolve the corporation, and that his stock was voted in favor of the proposition; and that he made no effort to rescind his contract until after the dissolution proceedings had been begun.

The master recommended the disallowance of the claim as a creditor, and exceptions were taken to his findings of fact and law.

*Herbert H. Ward* and *William W. Porter,* for receivers. *Christopher L. Ward,* for exceptant.

THE CHANCELLOR: ▉ The master has given several reasons why the claim should be disallowed, and without adopting all his reasons, I agree in his conclusions and some, at least, of his reasons. Some of the representations made to Springer by McMillan were so clearly puffing statements and of such an exaggerated character as that no one could reasonably have relied on them—such for in-

stance as statements that the investor was absolutely secure as to the amount of $10 per share, or that it was absolutely impossible for him (Springer) to lose $500 on a purchase of 23 shares of stock of the par value of $50. Such talk must be treated as an exaggeration as to the future prospects of the corporation and not a misstatement of a material existing fact upon which the claimant had a right to rely. Stockholders in every business corporation take risks of loss in the venture and no one should be heeded who professed to think otherwise.

██ Other statements were that the claimant was protected by the law under which the company was incorporated and that "the investment was absolutely secured for $10 per share by the law under which the company was incorporated." The master rightly found that these were representations as to the law, and the stockholder is chargeable with notice of the provision of the charter of the company and of the law governing the same; and furthermore, Springer was given the source of the truth of the statement, the law of the state where incorporated, and had equal opportunity with McMillan to verify the statements, even if it be the law of a state other than that in which Springer resided when he subscribed for the stock.

The reference must have been to the laws of Delaware, and having been given the source of the information, Springer was bound to investigate for himself the truth of the representations before relying thereon so explicitly as he testifies that he did. His assertion of his reliance on McMillan's statement of the law was extraordinary, because McMillan was known to Springer not to have been a person of skill or experience in such matters.

█ It is not clear either that Springer relied on the statements of McMillan for he testified that he didn't understand the explanations made by McMillan as to the law protecting the investor. Without understanding the explanations he could hardly have relied on them as statements of existing facts. It is made plain to me that the investment was made in reliance on the friendly advice of his old friend and believing in his good faith and sound judgment, rather

than as the result of an understanding examination into the character of the investment. Under such circumstances, Springer is not entitled to rescind his contract of membership of the corporation and become a creditor of the company.

It should be noted, too, that Springer does not undertake to give McMillan's statements accurately, for he confessed that he didn't understand part of it. Indeed, the alleged statements as to the security of the investment were so extraordinary that a doubt naturally arises whether they were made, especially in view of Springer's frank disclaimer of having really understood the remarks of his friend. But even assuming that they were made in just the form Springer testified to, and with no explanation, still they were not representations on which Springer had a right to rely, and he had an equal opportunity to verify them. His failure to do so does not give him a right to be changed from a partner in the enterprise to a creditor. *Pearce v. Carter, 3 Houst.* 385.

The master was right in excluding the claim.

(3) Exceptions to the disallowance by the master of the claim of Elizabeth C. Ruley, executrix of William W. Ruley, deceased.

William W. Ruley, during his life time, filed a claim against the defendant company, and at his death his executrix was substituted as claimant. The claim is for $6,700, made up of items of "cash" amounting to $7,200 with a credit thereon of $500. The record relating to this claim consists of minutes of meetings of the board of directors, cash books, vouchers, checks and ledger cards of the company, reports of the company filed with the Insurance Commissioner of the state of Delaware for the years 1907 and 1908 and testimony of witnesses. The minutes of the board of directors show that Ruley was president of the company prior to and during the period covered by the claim; that he resigned as such president on March 16, 1909, and as a director two days later; that on May 12, 1909, he presented a claim to the board of directors, which is a duplicate of the one filed by him in this cause, except that the items in the claim presented to the board of directors were charged as "advance on a/c of delinquent contingent fund a/c," instead of

"cash" as in the claim filed herein, and the credit entered as "Amt. refunded," instead of "Cash," and that the board of directors, after consulting counsel for the company, refused to pay the claim on the ground that no contract had been entered into by the company with Ruley concerning these payments. The books of the company show that on the dates set forth in the claim filed the respective amounts were received by the company from Ruley; that at the time the payments were made Ruley was not indebted to the company; that these payments were applied to the company's contingent fund; and that they were charged on the cash books of the company as "advance acct. delinquent contingent fund account," or "pmts. on contgt. fund of delinquent stock pmts.," or "back pmts. on stk.," or "a/c back paymts." The check for $500 credited on the claim is dated November 9, 1908, and the voucher, in pursuance of which this check was issued, had indorsed thereon "a/c return of contingent fund advances," was signed by one Williams, assistant treasurer, and marked "Approved" by William W. Ruley as president. The entry of the check in the cash book is "Return of advance, voucher #8654." The reports of the company for the years 1907 and 1908 to the Insurance Commissioner of Delaware show that Ruley, as president, made the affidavits as to their correctness, and that the liability of the company for the payments made by Ruley is not referred to therein. The testimony of one Smith, who was secretary of the company during the period covered by this claim, is that there was considerable money due from delinquent subscribers to stock and that the money received from Ruley was put in the contingent fund to offset payments due at that time; that he assisted Ruley in making up the reports to the Insurance Commissioner for 1907 and knew that the money paid to the company by Ruley, which at that time amounted to $5,000, did not appear in the report as a liability of the company to Ruley. The testimony of the assistant treasurer was that Ruley promptly paid his stock subscriptions; that at the time the payments stated in the claim were made Ruley was not indebted to the company; that Ruley took an active part in the preparation of the company's report to the Insurance Commissioner of Delaware for the year 1908, and that he (the assistant reasurer) assisted Ruley; that the contingent fund was

the excess amount received from the sale of stock above par; that the contingent fund was not kept separate and apart from the general assets of the company; and that item "Net received for surplus fund from capital stock" in the report to the Insurance Commissioner for 1908 was greater by $6,700 by reason of Ruley's payments, which were included therein.

The master recommended the disallowance of this claim and exceptions thereto were taken on behalf of the receivers and Ruley. The receivers excepted because the master did not find as a fact that the payments made by Ruley to the company constituted a voluntary contribution. Counsel for Ruley filed a number of exceptions, but their general exception and the exception filed by the receivers are the only ones considered.

*Herbert H. Ward* and *William W. Porter,* for receivers. *Caleb E. Burchenal* and *Randolph Sailer,* for claimant.

THE CHANCELLOR: The claim of Elizabeth C. Ruley, executrix of William W. Ruley, for $6,700 having been disallowed by the master, several exceptions to his findings were taken by the claimant, and the receivers have also filed exceptions. In view of the conclusion reached, it will be unnecessary to consider any of the exceptions of the claimant, except the general one to the disallowance of the claim, and the exceptions of the receivers to the effect that the master should have found that the payments made by Ruley to the company were gifts or contributions to the company.

The basis of the claim is that at the time Ruley paid the moneys to the company there was money due the company from the stockholders who were in arrears in their payments due on their stock to which they subscribed, the names of these delinquent stockholders not having been disclosed by the proofs. Part of the moneys due from such stockholders was payable to the contingent fund intended for use in extending and maintaining the business of the company. Ruley paid to the company moneys on several occasions, and the moneys so received were treated in the entries upon the cash books of the company as "advances" by Ruley on account of such arrears due from said delinquent stockholders. I consider that

this applies to all the moneys paid by Ruley to the company, as contained in the proof of claim, although the language of all the entries is not equally specific upon this point. It appears, then, that on the books of the company, Ruley not being then indebted to the company, advanced at various times moneys which were due to it from certain undisclosed and unidentified shareholders of the company. Standing alone, entries of that kind indicated an expectation on the part of Ruley that he would be repaid the moneys so advanced, and such an expectation is inconsistent with the gift. One of the meanings of the word "advance" is "a loan" and the use of the word quite naturally imports a reimbursement and the relation of debtor and creditor may be implied from the use of the word. 1 *Cyc.* 966; *Laflan & Rand Powder Co. v. Burkhardt,* 97 *U.S.* 110, 117, 24 *L.Ed.* 973.

In addition to this it appears that on November 9, 1908, a check was drawn to the order of Ruley for $500, approved by him as president, signed by one Williams, assistant treasurer, checked by the cashier and the voucher with it says that it was a payment "on account return of contingent fund advances," and Ruley received the money repaid by the check. This payment appears on the cash book of the company. When Ruley paid into the treasury of the company money which he did not owe to it (calling it an advance on account of the contingent fund), and afterwards repaid to himself as president, or was repaid by the other officers of the company, part of the money so paid by Ruley, the natural inference is that the relation of debtor and creditor arose. The repayment of part, or at least the receipt of payment of such money by one advancing it, is consistent only with the original intention of a loan and not a contribution or gift.

The entries of the original advances and the repayment of part thereof were shown by the books of the company. These books were open to inspection by the officers and directors and were audited by a special auditor, whose duty it was to make reports thereon to the directors, and the legal effect of these entries was presumably known to all. It is of no consequence, then, that there was no other entry on the books showing specifically that Ruley was a creditor of the

company to the extent of the advances because these entries in the cash book show that fact. For the same reason it is of no consequence that there is no averment proved that Ruley actually reported to the board of directors these particular advances.

There are circumstances in evidence both for and against the above conclusion, and these are discussed fully in the master's report and in the briefs submitted, but after weighing them all carefully my mind comes back to the evidence of intention as shown by the actual, undisputed entries on the books. These entries show the payment of moneys to the company (a fact not disputed) and also show that the payments were advances to the contingent fund of the company, Ruley not being then indebted to the company, and show subsequent payments to him of money expressly stated to have been paid on account of money advanced by Ruley to the contingent fund.

As before stated, I am of opinion that the legal effect of the transactions between Ruley and the company, respecting the money, was to constitute not a gift but a loan.

If Ruley had brought an action of assumpsit against the company to recover the moneys so paid, I believe that the evidence would warrant a verdict for the plaintiff for the full amount of his claim. The action of assumpsit is equitable in its nature, and recovery may be had in such action whenever one person is equitably entitled to money in the hands of another. The promise of repayment is in such cases.

In *Burton v. Wharton,* 4 *Har.* 296, 298, it was said of the action of assumpsit for money had and received, in a suit to recover from a defaulting vendor part of the purchase price paid: "The principle of this action is that it is not according to equity and good conscience that the defendant shall retain the money." The court in *Guthrie v. Hyatt,* 1 *Har.* 446, said:

"The action of assumpsit has been likened to a bill in equity. Whenever a man has in his hands money belonging to another which he cannot equitably retain and he either promises or the law can

raise an implied promise to pay it, it may be recovered in this form of action."

The same principle is more broadly stated in *Wright v. Wright,* 2 *Har.* 350, 352, thus:

"It is a general principle, that if a person receives money belonging to another, and has no legal or equitable right to retain it, the law deems this to be so much money had and received to the use of the owner, and raises a promise by implication from the person receiving it to pay it over."

■ The right of the claimant to be repaid money advanced to the company should not be less highly respected in a court of equity, than in a court of law having regard to principles of justice and right.

■ Undue weight was given to the actual misstatements in the reports made to the Insurance Commissioner by the company, which reports were sworn to by Ruley, and to a certain extent the literal effect of those reports was inconsistent with the existence at the time the reports were made of an indebtedness by the company to Ruley, its president. But, without justifying the making of erroneous reports, it is only fair to note that there were other inaccuracies in these reports which indicate that the reports were intended for a specific purpose, viz., to satisfy the Insurance Commissioner, and not as an accurate statement of all the affairs of the company. Clearly the making of the reports by Ruley was not intended as a waiver or relinquishment by him of any rights he had against the company by reason of having made advances of money to the company. The receipt of repayment in part of his advances clearly negatives a waiver or relinquishment of any right.

I am constrained, therefore, to disagree with the conclusions of the learned master, and find that as Ruley, or his representative, could have maintained an action of assumpsit based on an implied agreement to repay the money advanced by him, the claim made by him and prosecuted by his executrix should be allowed. The general exception to the disallowance of the claim will be sustained and the exception of the receivers disallowed.