ROBERT PENINGTON,

*vs.*

COMMONWEALTH HOTEL CONSTRUCTION CORPORATION, a corporation organized and existing under the laws of the State of Delaware.

HUGH MCATAMNEY,

*vs.*

BROADWAY, SEVENTH AVENUE & FIFTY-SIXTH STREET HOTEL REALTY CORPORATION, a corporation organized and existing under the laws of the State of Delaware.

*New Castle, July* 19, 1930.

*Charles C. Keedy*, for the receiver.

*William Prickett* and *Samuel Zirn*, of Brooklyn, N. Y., for preferred stockholders.

*Walter E. Godfrey*, of New York City, for certain stockholders.

*William F. Unger*, of the firm of Unger & Unger, of New York City, for a preferred stockholder.

*E. Ennalls Berl* and *Paul Leahy*, of the firm of Ward & Gray, for common stockholders.

*John Biggs, Jr.*, and *Mortimer Brenner*, of New York City, for stockholders' protective committee.

THE CHANCELLOR. The questions which the rival contentions in this case present concern stockholders only, the creditors having been satisfied in full. They involve a construction of the charter provisions which deal with the classes of stock authorized to be issued and their relation to a situation of liquidation and distribution of assets.

The pertinent charter provisions are as follows:

"The holders of the preferred stock of this corporation shall be entitled to receive and the corporation shall be obligated to pay thereon out of the surplus or net profits of the business of the corporation in each year dividends at the rate of seven per centum (7%) per annum and no more payable on such dates as may be fixed by the Board of Directors. Such dividends on the preferred stock shall be payable before any dividends shall be payable or set apart on the common stock and shall be cumulative, so that if dividends for any past dividend period at the rate of seven per centum (7%) per annum shall not have been paid thereon or set apart therefor, the deficiency shall be fully paid or set apart, but without interest, before any dividend shall be paid or set apart for the common stock.

"Whenever dividends at the rate of seven per centum (7%) per annum upon the preferred stock for all past dividend periods shall have been declared and the same shall have been paid by the corporation or funds for the payment thereof shall have been set aside, the Board of Directors, if the remaining surplus or net profits be sufficient therefor may declare dividends on the common stock at such rates and payable at such time as the Board may fix.

"After the payment of the said preferential dividend of seven per centum (7%) per annum to the holders of the preferred stock and noncumulative dividends of six per centum (6%) on the common stock the Board of Directors shall set aside twenty per centum (20%) of the remaining net profits for any year, as a sinking fund to be used in the purchase or redemption of the preferred stock, which fund shall be kept separate and apart from all other funds of the corporation.

"The moneys constituting the sinking fund shall be applied by the corporation in each year to the purchase of shares of the preferred stock at not exceeding $110 per share or the redemption thereof as herein provided.

"In the event of any liquidation, dissolution or winding up of the corporation, or upon any distribution of its capital, other than the redemption of its preferred stock, the holders of the preferred stock shall be entitled to be paid in full the par value thereof, and all unpaid dividends accrued thereon, before any amount shall be paid or any assets distributed to the holders of the common shares, and after the payment to the holders of the preferred stock of the amount payable to them as hereinbefore provided, the remaining assets and funds of the corporation shall be divided and paid to the holders of the common shares according to their respective shares."

The receiver now has in hand twenty-five thousand dollars. This sum will be very considerably augmented later on and it is desired that the method of distribution may be now defined so that when the ultimate fund is in hand, the stockholders may receive expeditious payments.

It should be borne in mind that the fund to be finally distributed represents less than the capital stock paid in. Not only does it contain no profits or surplus; it falls short of equalling invested capital.

The questions presented and the court's views will now be stated.

1. As to the stockholders who paid par and a premium for their stock, may the premium be regarded as capital paid in and as such may it share in the distribution? In other words, may stockholders who paid a premium for their stock be permitted to share in the distribution in proportion to what they paid for their shares rather than in proportion to the par value thereof? *Grone v. Economic Life Ins. Co.*, (*Del. Ch.*) 80 *A.* 809, decided by Chancellor Curtis, is an authority in the negative. So also are *In re Driffield Gas Light Co.*, [1898] 1 *Ch.* 451, and 1 *Machen, Modern Law of Corporations, par.* 522. These authorities are

persuasive and the order will direct that a premium paid above par should be disregarded in ascertaining the shareholder's proportion in distribution.

2. Under this head we are to consider a question which is presented by the fact that some of the shares, both preferred and common, all of the par value of one hundred dollars, were paid for in full and some of them only in part. There having been a loss whereby the assets, after paying debts and receivership costs and expenses, are insufficient to pay in full the entire capital paid in, the question arises of whether the partly paid shares may share in the distribution in the proportion that the amount paid on them bears to the total amount paid on all. If they may, it is apparent that the partly paid shares will be allowed to participate in such manner as to be relieved of bearing their equitably proportionate share of the losses.

For illustration, let us suppose a case where capital shares of a hundred dollars par are subscribed for in the amount of $1,500,000, that $1,000,000 has been fully paid, and $500,000 has been paid to the extent of fifty per cent. only. In that case the capital actually paid in is $1,250,000, and $250,000 is agreed to be paid into the capital account. The partially paid subscribers are liable for the latter sum. They have therefore paid and bound themselves to pay a sum equal to one-third of the capital. Now suppose the company loses $500,000 of the paid in capital of $1,250,000, whereby on liquidation it has only $750,000 left for distribution. If the partly paid stock participates in the distribution on a basis proportional to its actual payments, it would receive 250,000/1,250,000, or one-fifth of the $750,000 That would mean that it would receive $150,000 back from its cash investment of $250,000, a loss to it of $100,000. But it had obligated itself to be a one-third owner of the enterprise and if it were compelled to keep its obligation, its loss would be one-third of $500,000 or $166,666⅔. Thus by the method of distribution based on paid-in proportions, the stockholders who had only partly paid for their stock in the supposed case would be spared from bearing $66,666⅔ of loss which, had they performed their contract obligations, they would have been compelled to bear. Saving to them the burden of this loss means the

shifting of it to the shoulders of their associates in the enterprise who, unlike them, had kept their obligations to it to the full. Such a result would be highly inequitable.

In the instant case, the situation is such that justice demands that the partially paid stock should be required to equalize itself with the fully paid stock of the same class through a theoretical if not an actual performance of its contract obligations, before participating with it on a *pro rata* paid-in basis in the distribution of the depleted capital. It ought, before receiving benefits from the fund, to be required, so to speak, to do equity by it.

The authorities support this conclusion. *Re Anglesea Colliery Co.*, [1866] *L. R.* 1 *Ch.* 555; *Ex parte Maude*, [1870] *L. R.* 6 *Ch. App.* 516; *In re Weymouth & Channel Islands Steam Packet Co.*, [1891] 1 *Ch.* 66; *Wilton v. Soffery*, [1897] *A. C.* 299; *In re Wakefield Rolling Stock Co.*, [1892] 3 *Ch.* 165; *In re Anglo-Continental Corporation of Western Australia*, [1898] 1 *Ch.* 327; *Krebs v. Carlisle Bank*, 14 *Fed. Cas. No.* 7932; *Hartman v. Insurance Co. of Va.*, 32 *Grat.* (*Va.*) 242; *Graves v. Denny*, 15 *Ga. App.* 718, 84 *S. E.* 187; *Lex v. Selway Steel Corp.*, 203 *Iowa*, 792, 206 *N. W.* 586. The foregoing cases, as does the instant one, involved the question of the principle of distribution to be followed where assets, after debts and costs have been paid, fall short of meeting the paid-in capital and the stockholders to whom the distribution is to be made have paid for their stock in unequal amounts, some in full of par and some in part only of par. The question is treated by those cases as one of equalizing the burden of a loss before allotting participations in the proceeds of the residue, and the result of the rule announced by them is founded on the familiar maxim that equality is equity, a maxim which is applicable not only to rights but as well to burdens.

The New Jersey case of *Fitzgerald v. State Association*, 76 *N. J. Eq.* 137, 79 *A.* 454, 139 *Am. St. Rep.* 743, has been called to my attention as taking a contrary view. In that case there was a loss of capital and the Vice-Chancellor adopted as the principle of distribution among stockholders a *pro rata* division based on the amount paid in, treating fully paid and partly paid stock exactly alike. In the case before him, however, the question here raised does not appear to have been discussed. It was the

case of an insolvent building and loan association and the Vice-Chancellor's opinion seems to have been based on the New Jersey statute governing such associations. The phase of the controversy moreover which evoked the expression of opinion concerning the principle of distribution above referred to, presented a contest between stockholders who had given notice of withdrawals and by reason thereof took the position that they were entitled under the by-laws and statute to be paid in full as against those who had not. His opinion is to be read in the light of these facts. When so read it does not in my judgment bear upon the question the instant case presents.

My attention has also been called to 8 *Fletcher, Cyclopedia of Corporations,* § 5689, as an authority opposed to the conclusion hereinbefore stated. The only authority cited by Fletcher in support of his text is the Delaware case of *Grone v. Economic Life Ins. Co., supra,* which as hereinafter pointed out is distinguishable from the one now before me. The language from Fletcher is not inconsistent with the idea that it is applicable to liquidation proceedings in those cases only where the capital paid in has suffered no loss. I do not, therefore, regard Fletcher as an authority opposed to the views herein adopted. Neither is the author of *Thompson on Corporations, Vol.* 8 (*3d Ed.*) *Par.* 6544, an authority *contra,* for that author in the section referred to expressly recognizes that on distribution in winding up proceedings it is proper to adjust and equalize the situation of stockholders who have paid, some in full and others in part.

There is a class of cases other than those hereinbefore cited, which applies the same principle of equalizing fully paid and partly paid stock before distribution is made of a fund in liquidation. Those cases, unlike this, are where instead of a capital deficit being found, the fund is sufficient to reimburse all capital paid in and contains in addition a surplus. The same logic which the courts applied in the cases above cited in reaching the conclusion that all the stock should be subjected to a process of leveling and equalizing where there is a loss to be borne, was adopted by the class of cases I am now referring to where there is a profit to be shared. In this class of cases are the following: *Birde v. Croppen,* [1889] 14 *A. C.* 525; *In re Driffield Gas & Light*

Co., [1898] 1 *Ch.* 451. The Delaware case of *Grone v. Economic Life Ins. Co.*, (*Del. Ch.*) 80 *A.* 809, I think, on its facts belongs to this class. I say this, because a reading of the report shows the case to be one of a dissolution receivership and at no place discloses that the capital had suffered a loss. The *Grone case* is therefore not an authority that covers such a state of facts as the instant one presents. It disagrees in its result with the two English cases just cited, in that it adopts the rule of distribution based on amounts paid in without reference to the principle of equalization and leveling. If it were similar in its facts to the instant one, I would feel impelled in all deference to disagree with it. The *Grone case* emphasizes the necessity of seeking equality as the basis of equity. How that can be done in such a case as the present one except by requiring the partly paid stock to bring itself on a footing of equality with the fully paid stock, it is difficult to see. Whether, where there are profits to be divided in addition to the paid-in capital, partly paid stock should be charged with the balance due on it before distribution is made, as the two English cases appear to hold, or the distribution should be effected in proportion to the amount paid in, as the *Grone case* holds, is a question which the pending case does not present. I therefore leave it open.

It is sufficient in this case to say that before any distribution is made to either preferred or common stock, there must be an equalization in each class of all shares, whereby the partly-paid shares are brought to the same footing as the fully paid ones. How this is to be done is a mere matter of practical convenience. In 1 *Machen, Modern Law of Corporations, Sec.* 521, the subject is dealt with and three methods of effecting the equalization scheme are pointed out. The *Section* is as follows:

"Where assets are insufficient to return paid-up capital. Where in a winding-up, the assets after paying debts are not sufficient to return all the paid-up capital, they must first be applied, if more has been paid in on some shares than on others, in repaying to the holders of the first class of shares the difference between the amounts paid upon them and on the other shares and if the assets are not sufficient to make good this difference, then a call must be made on the other shareholders sufficient to do so. This result, in an ordinary case where some of the shares are fully paid and some partly paid, may be reached by several different methods of accounting.

"(a) Method I. In the first place, the amount remaining unpaid on the partly-paid shares may be called in; and the sum thus obtained plus any assets remaining after the payment of debts and expenses should then be divided *pro rata* among all the shareholders, all of whom, after the call, stand on an equality in respect to the amounts paid in. Of course where this method is adopted, there is no need actually to make and collect the full amount of the call, but by a short calculation the net amount to be paid or received by the shareholders of the two classes respectively may be determined, and the necessary distributions or assessments may then be made. This method of accounting is always available, and will in the long run prove the simplest.

"(b) Method II. Secondly, the assets in hand (after paying debts and costs of liquidation) may be used in returning to the holders of fully-paid shares the difference between the amounts paid on their shares and the amounts paid on the partly-paid shares; and the balance, if any, should then be distributed *pro rata* among all the shareholders in proportion to the par value of their shares. When this method is adopted, the shareholders who have paid in the larger amounts cannot demand that interest on the excess of the amounts paid on their shares over the amounts paid on the other shares be paid to them before any distribution is made to the other shareholders, unless the advance payments were made under contracts stipulating for interest thereon. Where the surplus assets are not sufficient to equalize the amounts paid up on the two classes of shares by returning the excess payments to the holders of the first class, then a sum sufficient for that purpose must be raised by a call on the second class of s' ares; but the matter is more complicated than when the former method of accounting is used.

"(c) Method III. The third method of accounting is still more complicated. According to that method, a sum should be raised by a call on the partly-paid shares sufficient to pay to the paid-up shareholders enough to make the two classes of shares, after the call on the first class and the distribution of the proceeds thereof among the holders of the second class, stand on an exact equality in respect to the amounts paid in; after this process of equalization has been completed, any assets in hand, remaining after payment of debts and expenses, should be distributed *pro rata* among all the shareholders.

"All these three methods of accounting lead to the same result; but as a practical matter it is submitted that the first is decidedly preferable."

The accounting method (*Machen's No.* 1) appears to be best adapted to the situation of this receivership. The judgment of the receiver will, however, be accepted as controlling in this matter of method.

3. The last question concerns the right of preferred stock

to be paid dividends in arrear out of the fund in hand. The preferred stock was created by amendment to the charter filed March 13, 1916. The pertinent charter provisions defining the rights of preferred stock are quoted in the statement of the case *supra*.

The company never had any surplus or net profits from the time of its organization. The receivership found it with a capital deficit.

The question is, then, whether preferred dividends, which were agreed to be cumulative, may be charged against capital funds, there never having been any surplus or net profits.

Of course if the company were a going concern, dividends could not be paid to the preferred stock unless there were a surplus or net earnings out of which to pay them. Not only does the charter fail to assume to authorize dividends in such case, but the law would forbid them.

It is argued, however, that inasmuch as the company has ceased to be a going concern and its debts are all discharged, we are to consider the question as one solely between the stockholders without reference to the statute's prohibition against paying dividends from capital. In other words, we are to consider the question as solely one of contract between the common owners of a fund and that the terms of the contract are to be found in the above quoted provision of the charter. This, I think, is the proper angle of approach to the question, for, on liquidation, after all charges ahead of stockholders' rights are fully satisfied and nothing is left to be considered but the question of dividing money belonging to a numerous group of people, it is entirely permissible for the interested owners of the common fund to agree among themselves as to the proportions of ownership each is to enjoy and the manner of its ascertainment.

The question, therefore, is one that calls for a construction of the article of the charter quoted in the statement of the case. The last paragraph of the quoted provisions deals specifically with the situation that has arisen. It provides how the assets of the corporation shall be divided among the two classes of stockholders on liquidation or distribution of the capital. "The holders of the preferred stock shall be entitled to be paid in full the par

value thereof, and all unpaid dividends accrued thereon, before any amount shall be paid or any assets distributed to the holders of the common shares," and after such payment to the preferred stockholders all the remaining assets and funds are made divisible among the common stockholders.

What does the phrase "all unpaid dividends accrued thereon" mean? The preferred stockholders contend that the words mean to create a dividend charge regardless of whether there have been net profits or a surplus. They say that though a dividend can never be said to accrue while the concern is a going one unless net profits or a surplus are conjoined with the passage of the regular time periods for the dividend payments, yet on liquidation the passage of time needs not to be conjoined with the existence of net profits or a surplus, but alone and of itself will cause dividends to accrue. Excerpts are quoted from the opinion in *Morris v. American Public Utilities Co.*, 14 *Del. Ch.* 136, 122 *A.* 696, in support of this contention. Such excerpts are not to be so regarded. The *Morris case* was not a liquidation case. The corporation in that case was a going concern. The holding in that case was that the right to cumulative preferred dividends after the specified date for their payment had passed, was a vested right which could not be taken away without the consent of the preferred stockholder. But it was specifically indicated that such right was matured only when profits or a surplus existed out of which dividends could be paid. From this statement it is apparent that the *Morris case* is entirely dissimilar in principle to the one *sub judice*, and that to wrest a sentence or clause of the opinion from its entire context and give it an application to the instant case where a totally different set of facts and an entirely different problem is presented, would constitute an unwarranted use of the court's language. Judges ought not to be expected to hedge every word they utter with a cautionary and tedious repetition of the limitations which the facts and other expressions in their utterances evidently impose.

The opinion in the *Morris case* therefore supplies no assistance here. It does recognize however the general rule about which there can be no controversy, that in order for dividends,

preferred as well as common, to be paid by a going concern there must be a surplus or net profits.

But that is not our question. The question here is whether the existence of net profits or a surplus must be shown in order for unpaid preferred dividends to be paid when the corporation has ceased to be a going concern and its assets are in course of liquidation and distribution in accordance with the terms of a contract such as the common owners of the fund in this case have agreed upon.

Dividends upon the preferred stock were in the present case unpaid. The contract, however, requires something more than that they should be unpaid. They must also have accrued. The phrase is "all unpaid dividends accrued thereon." It is difficult to escape the connotation of the word "dividends." I am aware that the word may be and quite frequently is used in the sense of a sum received in a way other than by a periodic distribution from earnings of an active concern. What, for instance, the stockholders ultimately receive in this liquidating receivership may be called a dividend. But certainly that cannot be the sense in which the word is here used. "Dividends" in its ordinary meaning implies the idea of a distribution of assets obtained in excess of capital. In the first paragraph of the charter contract in this case, the word is manifestly used in that sense. At the outset it is plainly provided that the preferred stock shall receive its dividends only in case there are net profits or a surplus to justify them. The effect of the preferred stockholders' contention is that where the same word is again employed in the same contract in its subsequent liquidation clause, it has another and different meaning; that in the latter instance it indicates something distributable out of capital. If that be so, then the preferred dividend becomes the equivalent of an interest charge and the common stockholders, in case of liquidation, are bound to pay it even though their entire capital investment be exhausted in the process. If the word "dividend" is thus to be converted into the equivalent of interest, not only will its ordinary meaning be rejected, but the significance of the modifying adjective "accrued" will be over-looked. That word signifies something. It cannot mean that mere failure of the corporation to

pay at periodic intervals is meant to be covered by "accrued." That idea is fully covered by "unpaid." Not only must the stipulated dividend have been unpaid; in addition it must also have accrued. What this additional thing of accrual can mean I cannot imagine, unless it be that it means that there must have been the existence of net profits or surplus out of which the dividends were obliged by the contract to be paid but were not paid, and in that sense became accrued. Attributing this significance to the word "accrued" would be harmonious with the conception of dividends in general and with the conception of it as the parties to this contract had by their previous language particularly disclosed their understanding of it to be.

The general rule is that preferred stock enjoys only those preferences which are specifically defined and that as. to all matters lying outside the field of defined preferences, preferred stock has no rights which are not shared equally with the common stock. Hence if dividends in arrear are not made a specific charge on the assets representing capital paid in, they cannot be paid out of such assets on liquidation. *Gaskill v. Gladys Belle Oil Co.*, 16 *Del. Ch.* 289, 146 *A.* 337. The contention of the preferred stockholders in the instant case seeks to establish a right in derogation of this general rule of law. While there is no legal objection to the creation of such right by proper agreement of the parties, yet it would seem that before such exceptional right is recognized it ought to appear clearly that the parties have intended to create it.

My conclusion is that construing the language of the contract as a whole, the preferred stock is given the assurance of a fixed yearly dividend payable only in case there are net profits or there is a surplus in any year out of which they can be made, that if net profits or a surplus never existed, the right to the dividend never accrued, and that never having accrued payment cannot be demanded out of the capital account on liquidation.

If we look to the authorities which deal with this question, we find them to be surprisingly few in number. What cases there are, are not in accord. The first case which deals with the question is that of *W. J. Hall & Co., Ltd.*, [1909] *L. R.*, 1 *Ch.* 521. That case supports the conclusion I have reached in this one. It was

followed and accepted as authoritative by the Appellate Division in New York in the case of *Michael v. Cayey-Caguas Tobacco Co.*, 190 *App. Div.* 618, 180 *N. Y. S.* 532. After the case in the New York Appellate Division, however, the *W. J. Hall case* was criticized by way of *obiter dictum* in the later English case of *Chinese Antimony Co., Ltd.*, [1916] 2 *Ch.* 115, and its authority rejected in the analogous case of *In re Springbok Agricultural Estates, Ltd.*, [1920] 1 *Ch.* 563. Thus, the English authority cited by the Appellate Division in New York in support of its views has been rejected by an English court of equal dignity. The reasoning of the *Hall case*, however, and of the New York Appellate Division, which is similar to what I have hereinbefore attempted to express, appeals to me as better founded and I accordingly feel bound to follow it.

One other American authority is to be found in opposition to the conclusion herein reached. I refer to the Virginia Supreme Court of Appeals which decided two cases reported as *Drewry-Hughes Co. v. Throckmorton* (1917) 120 *Va.* 859, 92 *S. E.* 818, and *Johnson v. Johnson & Briggs* (1924) 138 *Va.* 487, 122 *S. E.* 100. The latter case made reference to the *Michael case* in the New York Appellate Division and declined to follow it. The Virginia court in *Johnson v. Johnson & Briggs*, which was the last case before it, appears to rest its conclusion on this consideration, viz., that if the dividends in arrear are meant to be paid only in case there are earnings or surplus, then the provision for them in the liquidation clause is useless and surplusage, for, says the Virginia court, if there are earnings, the dividends in arrears would be payable as a matter of law without the aid of the clause. It is with great respect and in all deference that I announce myself as unable to accord to this consideration which appears to have controlled the Virginia judges, the weight which they allowed it. It seems to me that when the parties to this contract approaced the question of reducing to terms their agreement in the event of liquidation, one of the contingencies that might arise in the course of the corporation's history, it was but reasonable for them to put in express terms their entire rights, to the end that the scheme of division should be laid out as a symmetrical whole. That is what the liquidation clause

both in the Virginia case and in the instant case appears to me to do. Where the rights are expressly defined, no room could be left for argument as to implied ones or as to rights which the general law would read into the contract. And so, if to construe the clause as did the court in the *W. J. Hall & Co. case*, and in the *Michael case* and as I do in this case, is to make it contain a legally redundant provision, nothing more is to be inferred from that circumstance than that in an orderly and symmetrical statement of a complete scheme of distribution such a so-called redundant clause has its place. In line with this thought it is to be noted that after the preferred stock receives from the assets the sums specifically allotted to it, the clause then proceeds to say that the balance remaining shall belong to the common shares. Now, can there be any doubt that the general law, after the preferred stock was paid its contract sum, would give the common shares such a balance? If so the express provision to that end is equally redundant with the other one. This consideration seems to emphasize what I have already said, that the liquidation clause, having set its hand, so to speak, to dealing with the subject of a final distribution of assets, undertakes to deal with it in its entirety and accordingly declares the ranking order of rights even at the expense of redundancy, to the end that nothing may be left to argument or inference, and the whole may be expressly set forth.

Inasmuch as there never were any net profits or a surplus out of which preferred dividends could have been paid, and therefore no unpaid preferred dividends have ever accrued, the capital fund in hand is not chargeable with any. This conclusion renders it unnecessary to consider the point, which was debated, of whether accrued dividends are to be calculated as of the date of the receivership or as of the date of the dissolution.

Order accordingly.

NOTE.—On appeal from the order entered in accordance with the foregoing opinion, the Supreme Court in part reversed the order of the Chancellor. The opinion of the Supreme Court is reported *post p.* 394. See also 156 *A.* 259.