Thomas R. **WAGGONER** and Patricia
L. Waggoner, Defendants
Below, Appellants,

v.

LaMar F. **LASTER,** John R. Ford, Howard P. Silverman, Peter J. Utrata, M.D., Joseph C. Gathe, M.D. and Austin P. Murray, M.D., Plaintiffs Below, Appellees.

Supreme Court of Delaware.

Submitted: May 30, 1990.
Decided: Oct. 15, 1990.

Lawrence A. Hamermesh, Alan J. Stone, Morris, Nichols, Arsht & Tunnell, Wilmington, Frederick R. Dettmer (argued), Le-Boeuf, Lamb, Leiby & MacRae, New York City, for appellants.

David C. McBride (argued), Josy W. Ingersoll, Vincent J.X. Hedrick, II, Young, Conaway, Stargatt & Taylor, Wilmington, Todd E. Gordinier, Payne L. Templeton, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for appellees.

Before CHRISTIE, C.J., MOORE and HOLLAND, JJ.

MOORE, Justice.

In this case we review issues involving the alleged creation of preferred stock with super-majority voting rights. Thomas R. Waggoner and Patricia L. Waggoner (the "Waggoners") appeal from a judgment of the Court of Chancery determining that the board of directors (the "Board") of STAAR Surgical Company ("STAAR") consists of LaMar F. Laster ("Laster"), John R. Ford ("Ford"), Howard P. Silverman ("Silverman"), Peter J. Utrata ("Utrata"), and Thomas R. Waggoner ("Waggoner").[1] Waggoner had attempted to replace the other members of the Board by executing a written consent purporting to vote the preferred stock in question. The Court of Chancery assumed without deciding that the preferred stock held by Waggoner was validly issued, but nonetheless ruled that the super-majority voting rights were void. Accordingly, Waggoner's attempted removal of the other directors was improper.

We agree and affirm.

I.

In October, 1982, STAAR was organized by Waggoner as a California corporation to develop, produce, and market patented soft intraocular lenses ("IOLs") and related products used primarily in cataract surgery. Later, in April 1986, the company was reincorporated in Delaware. Its common stock has been traded over-the-counter

---

1. The plaintiffs consist of the four directors other than Waggoner (Laster, Ford, Silverman and Utrata) and two STAAR shareholders (Joseph C. Gathe and Austin P. Murray).

since July 7, 1983. From its inception, Waggoner has served as STAAR's Chief Executive Officer and President.

By 1986, several factors threatened STAAR's continued profitability. It thus embarked on a diversification program which ultimately proved unsuccessful. By 1987, STAAR faced mounting financial difficulties. It was overdrawn by approximately $1 million on a line of credit with the Bank of New York ("BONY"); BONY was demanding personal guarantees from Waggoner on $3.5 million in corporate debt; and STAAR was overdue on additional debt of nearly $1.8 million. When certain stockholders became aware of the mounting debt, they demanded Waggoner's resignation. A compromise was reached, and two of the dissenting shareholders were elected to the Board.[2]

At a board meeting on December 13, 1987, it became clear that only Waggoner was willing and able to guarantee the corporate debt in the near future and on such short notice. Although the evidence was conflicting, the Vice Chancellor assumed without deciding that Waggoner agreed to provide personal guarantees and stock pledges for substantially all of STAAR's debt. In return the Board issued convertible preferred stock to Waggoner as compensation for these agreements. Apparently, because of earlier demands for his resignation, Waggoner required that voting control of STAAR be given to him while his personal guarantees were outstanding. He now contends that the preferred stock issued to him contained super-majority voting rights to achieve that end. By contrast, the other directors and shareholder-plaintiffs maintain that the Board never approved the issuance of the preferred stock, much less preferred stock with super-majority voting rights.

STAAR's financial difficulties continued through 1989, at which time the Board sought to raise additional capital by merging with or selling some of its assets to another company. Two companies, Vision Technologies, Inc. ("VTI") and Chiron Corporation ("Chiron"), made proposals to merge with STAAR or to acquire certain of its assets. At a meeting held on July 22, 1989, the four directors other than Waggoner concluded that VTI's proposal was more viable and terminated negotiations with Chiron.[3] Indeed, the Board unanimously approved a resolution "to proceed expeditiously to attempt to complete the proposed VTI transaction". *Laster v. Waggoner*, Del.Ch., C.A. Nos. 11063 & 11067, Jacobs, V.C., slip op. at 22, 1989 WL 126670 (Rev. Oct. 24, 1989). Waggoner, however, continued to hold discussions personally with Chiron without informing the other directors. Notably, under the Chiron proposal Waggoner would continue to be employed by the successor corporation to STAAR, whereas under the VTI proposal he would be terminated.[4] Moreover, Waggoner had apparently decided that, if necessary, he would remove the other directors using his preferred stock voting rights.

On the evening of August 10, 1989, another director discovered Waggoner conferring with Chiron representatives in STAAR's offices. The Board met the following day to consider removing Waggoner from the Board and stripping him of his positions as President and CEO. Before a vote could be taken, however, Waggoner executed a stockholder's written consent

---

**2.** Utrata joined the Board immediately, and David Brown was elected on December 17, 1987.

**3.** VTI proposed to merge the two companies and make a public offering to raise approximately $7 to $10 million in new capital. By contrast, Chiron sought to acquire STAAR's IOL business for $6 million plus a promissory note for $10 million payable in five years. The Board apparently favored VTI's proposal because it would leave STAAR's core business, the production of IOLs, intact.

**4.** The appellees suggest that the Chiron proposal would effectively gut the company and disenfranchise shareholders, leaving no assets, cash or continuing business for STAAR's shareholders and creditors. Waggoner, on the other hand, denies that shareholders would be adversely affected and contends that Chiron's proposal to exchange STAAR's assets for $6 million in cash and $10 million in promissory notes would leave sufficient resources to satisfy creditors and provide additional money to distribute to shareholders or invest in new ventures.

purporting to vote his super-majority voting preferred stock to oust the other directors, to reduce the size of the Board to three members, and named himself and his wife to the new board. Thereafter, Waggoner and his wife held a board meeting at which they purported to remove Laster from his corporate offices and to approve the Chiron transaction.

After filing actions in California and the United States Bankruptcy Court, the plaintiffs brought civil actions in Delaware to determine the lawful members of STAAR's board under 8 *Del.C.* § 225 and to enjoin Waggoner from causing STAAR to enter into the Chiron transaction.[5] After expedited discovery and a full trial, the Vice Chancellor concluded that the board lacked authority under STAAR's certificate of incorporation to issue preferred stock to Waggoner with super-majority voting rights. He concluded that Waggoner's attempt to remove the other directors was invalid. In his decision the Vice Chancellor focused on two events which are relevant to this appeal: STAAR's reincorporation in Delaware in 1986, and the alleged approval and issuance of preferred stock with super-majority voting rights to Waggoner in 1987.

*STAAR's Reincorporation in Delaware and Proposal 2*

STAAR's California certificate of incorporation authorized the board to issue twenty million shares of common stock; it contained no authority to issue preferred stock. By contrast, STAAR's Delaware certificate of incorporation expressly authorized the board to issue both common and preferred stock. Article *Fourth* of the Delaware certificate provides:

(a) The Corporation shall be authorized to issue THIRTY MILLION (30,000,000) shares, consisting of TWENTY MILLION (20,000,000) shares of Common Stock, each of the par value of $.01 ("Common Stock") and TEN MILLION (10,000,000) shares of Preferred Stock, each of the par value of $.01 ("Preferred Stock").

(b) The designations and the powers, preferences and rights, and the qualifications or restrictions thereof are as follows:

Except as otherwise required by statute or provided for by resolution or resolutions of the Board of Directors, as hereinafter set forth, the holders of the Common Stock of the Corporation shall possess the exclusive right to vote for the election of directors and for all other corporate purposes.

The Preferred Stock shall each be issued from time to time in one or more series, with such distinctive serial designations as shall be stated and expressed in the resolution or resolutions providing for the issue of such shares from time to time adopted by the Board of Directors; and in such resolution or resolutions providing for the issue of shares of each particular series the Board of Directors is expressly authorized to fix the annual rate or rates of dividends for the particular series and the date from which dividends on all shares of such series issued prior to the record date for the first dividend payment date shall be cumulative; the redemption price or prices for the particular series; the rights, if any, of holders of the shares of the particular series to convert the same into shares of any other series or class or other securities of the Corporation or of any other corporation, with any provisions for the subsequent adjustment of such conversion rights; and to classify or reclassify any unissued Preferred Stock by fixing or altering from time to time any of the foregoing rights, privileges and qualifications.

Notably absent from the various powers, preferences and rights enumerated in the third paragraph of subsection (b) of the

---

5. The Waggoners also filed a civil action to determine whether they were entitled to vote two million shares of common stock they received upon converting one share of convertible preferred stock previously issued to Waggoner. The Court of Chancery determined that the two million common shares had been invalidly issued but that the Waggoners were still entitled to vote them. *Waggoner v. STAAR Surgical Co.*, No. 11185, Jacobs, V.C., 1990 WL 28979 (Mar. 15, 1990). That decision is now currently before this Court on appeal.

Delaware certificate was any reference to voting rights or super-majority voting rights.

The decision to reincorporate in Delaware and to authorize the Board to issue preferred stock stemmed from two proposals presented to shareholders at the annual meeting on March 17, 1986. Proposal 2 is the significant issue here. It purported to amend STAAR's articles of incorporation to authorize ten million shares of preferred stock at $1.00 par value per share. Proposal 3 was to reincorporate STAAR in Delaware. The parties do not dispute that Proposal 3 was adopted. Both recognize that STAAR filed a valid certificate of incorporation in Delaware on April 3, 1986, approximately two weeks after the annual meeting. The parties' disagreement focuses on Proposal 2. The trial court concluded that "[t]he record does not disclose whether [Proposal 2] was adopted." *Laster*, slip op. at 34.

The evidence at trial centered on the testimony of STAAR's corporate counsel, Elliot H. Lutzker ("Lutzker"), who prepared the Delaware certificate. At his deposition, Lutzker testified that he used and relied upon Proposal 2 in preparing the new certificate, but his testimony as to whether Proposal 2 was adopted and meant to apply to the Delaware certificate was equivocal. Before looking at the proxy materials he stated that "there was no action ... taken vis-a-vis the California certificate of incorporation." After examining the proxy materials, he stated that the proposed amendment (Proposal 2) was approved by the stockholders, although he remained uncertain whether it applied to the California or the then unformed Delaware corporation. Adding to the confusion, Lutzker repeatedly testified that there was no error in the Delaware certificate as originally filed.[6]

The other evidence of record is no clearer than Lutzker's testimony. The proxy statement for the annual meeting did not state whether Proposal 2 related only to the then-existing California certificate or also to a new Delaware certificate (in the event Proposal 3 was adopted). Moreover, aside from Lutzker's testimony, there is no evidence that Proposal 2 was adopted. Although the California certificate authorized the issuance of preferred shares, it did not use the language of the amendment in Proposal 2. Proposal 2 "authorize[d] the Board of Directors to determine, among other things, with respect to each series of Preferred stock which may be issued ... whether, and to what extent, the holders of the series would have voting rights in addition to those prescribed by law." By contrast, the Delaware certificate made no reference to the Board's authority to determine the voting rights of preferred shareholders. It also contained the paragraph under Article *FOURTH*, subsection (b) beginning "Except as otherwise required", yet the original Proposal 2 had no such paragraph.

*The Board's Alleged Approval and Issuance of Convertible Preferred Stock to Waggoner*

We thus return to the December 13 board meeting, at which the arrangements with Waggoner to guarantee certain STAAR debts were first proposed. This was followed by the board meeting on December 17. The trial court described this latter meeting as follows:

The December 17 meeting was conducted by telephone with little or no advance notice, and lasted for approximately 25 minutes. Dr. Utrata, a Board member of only four days' standing, participated between performing surgical operations. Mr. Ford, a trial attorney, participated while speaking from his car phone and while traveling between court appearances. According to the minutes, Mr. Silverman was absent for a portion of the discussion, and Mr. Sodero, a fourth director, intended to (and did) re-

---

**6.** After this action commenced, STAAR filed a certificate of correction, pursuant to 8 *Del.C.* § 103(f). The certificate of correction stated that the phrase "the voting powers for the particular series [of preferred stock] was inadvert-ently omitted" from the list of preferred stock rights and powers which the Board was authorized to create. In light of its timing, the trial court gave little weight to the document.

sign at the conclusion of that meeting, to be replaced by Dr. Brown.

*Laster,* slip op. at 8.

The minutes of the December 17 meeting, prepared by Lutzker, recite that the Board approved the following resolution:

> RESOLVED, that pursuant to the authority granted to the Board of Directors in the Certificate of Incorporation, as amended, the Board hereby authorizes the creation of a series of Convertible Preferred Stock, all of which shall be held by Tom Waggoner, or his designees, which shall be converted into two million shares of Common Stock after January 16, 1988, unless all of the personal guarantees and stock pledges of Common Stock by Tom Waggoner now or hereafter in effect are removed, or a binding agreement to such effect is in place by January 16, 1988. In the event that all of the Waggoner guarantees are removed by January 16, 1988, all of the shares of Convertible Preferred Stock shall be redeemed by the Company at $.01 per share. In the event that the two million shares of Common Stock are issued to Tom Waggoner, all of the remaining Convertible Preferred Stock shall be redeemed if all of the Waggoner guarantees and stock pledges are removed. Holders of the Convertible Preferred Stock shall be entitled to elect a majority of the Company's directors and to otherwise vote a majority of the Shares of Common Stock outstanding at any time. The shares of Convertible Preferred Stock, in accordance with the provision of the SEC's safe-harbor rule, shall have a liquidation preference however, [sic] not entitle the holder to any dividends.

The trial court found that this resolution was never formally approved by the board. Only Waggoner signed the minutes of the December 17 meeting.

Nevertheless, on December 18, 1987, Waggoner was issued 100 shares of preferred stock with the following special rights and preferences.[7] First, Waggoner was authorized to convert one share of the preferred stock into two million shares of common stock unless all of his personal guarantees and pledges were cancelled by January 16, 1988.[8] Second, even after converting one share of the preferred stock into two million shares of common stock, Waggoner retained voting control by virtue of the preferred stock's super-majority voting rights so long as *any* of his personal guarantees remained outstanding. The Certificate of Designations was signed by Waggoner and Lutzker, but subsequently the rights and preferences were detailed in press releases, memoranda, and Securities and Exchange Commission filings sent to, and in some cases signed by, the directors.

## II.

The Court of Chancery determined as a matter of law that STAAR's certificate of incorporation did not expressly authorize the Board to issue preferred stock with super-majority voting rights. In the absence of such express authorization, it concluded that Waggoner's written consent purporting to oust the other directors was invalid. The interpretation of language in a certificate is a question of law subject to *de novo* review by this Court. *Gilbert v. El Paso,* Del.Supr., 575 A.2d 1131, 1141–42

---

7. Lutzker could not recall whether the directors were given a draft of the Certificate of the Designations, Rights and Preferences of the new series of preferred stock prior to the December 17 meeting. Arguably, the rights and preferences described by the Certificate take a very broad view of the rights and preferences listed in the resolution allegedly approved by the Board. Some of the directors apparently had different interpretations of what rights and preferences would be granted. Laster and Ford believed that Waggoner's voting control was only exercisable in the event dissident shareholders attempted to oust him. Ford and Utrata thought that *all* of the preferred stock would convert to two million shares of common stock and that this additional common stock, when combined with Waggoner's own shares of STAAR, would secure his voting control.

8. When the pledges were not rescinded by January 16, 1988, Waggoner converted one share of preferred stock into two million shares of common stock. The estimated value of the common stock he received at the time of the conversion was $499,000.

(1990); *Cavalier Oil Corp. v. Harnett*, Del. Supr., 564 A.2d 1137, 1141 (1989); *Klair v. Reese*, Del.Supr., 531 A.2d 219, 222 (1987). The Court of Chancery also ruled that certain extrinsic evidence of the shareholder's intent was insufficient to warrant reformation of the certificate. Such factual determinations will not be disturbed unless the trial court's findings or inferences are not supported by the record or not the product of an orderly and logical deductive reasoning process. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

The Waggoners assert three points of error. First, they contend that the Court of Chancery erred in determining as a matter of law that STAAR's certificate lacks an express grant of authority to the Board to issue preferred stock with super-majority voting rights. Second, they argue that it erred in failing to reform or correct STAAR's certificate in light of the extrinsic evidence of the intention of the shareholders and drafters to include a provision concerning the voting rights of preferred stock. Finally, they maintain in equity that estoppel should prevent the appellees from denying the validity of the preferred stock with super-majority voting rights issued to Waggoner. The appellees dispute each of these contentions.

### III.

■ The primary issue in this case is whether the Court of Chancery correctly concluded that STAAR's board of directors lacked authority under STAAR's certificate of incorporation to issue convertible preferred stock with super-majority voting rights. Without such authority, those voting rights held by Waggoner, which he contends allow him to vote out the other directors, are null and void.

### A.

We start with basics. The Delaware General Corporation Law allows corporations to issue preferred stock with special designations. 8 *Del.C.* §§ 151(a); 102(a)(4). Section 151, which outlines the general corporate power to issue stock and dividends, provides:

*Every corporation may issue 1 or more classes of stock ... which classes ... may have such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority vested in it by the provisions of its certificate of incorporation.*

8 *Del.C.* § 151(a) (emphasis added). Section 102(a)(4), which deals specifically with the technical formation of corporations, provides:

*The certificate of incorporation shall also set forth a statement of the designations and powers, preferences and rights, and the qualifications, limitations, or restrictions thereof, which are permitted by § 151 of this title in respect of any class or classes of stock or any series of any class of stock of the corporation and the fixing of which by the certificate of incorporation is desired, and an express grant of such authority as it may then be desired to grant to the board of directors to fix by resolution or resolutions any thereof that may be desired but which shall not be fixed by the certificate of incorporation.*

8 *Del.C.* § 102(a)(4) (emphasis added). Section 151 specifically includes voting rights among the list of stock attributes that directors may be empowered to set.

STAAR's Delaware certificate of incorporation authorized the board to issue preferred stock. Indeed, it specifically allowed the board to establish certain stock preferences, including dividends, redemption prices, conversion rights, and reclassification rights. It did not, however, expressly authorize the board to establish special voting rights for preferred stock. In light of that omission, and Delaware's statutory requirement that such powers be enumerated in the certificate of incorporation, the Vice Chancellor found that the

record was insufficient to establish that STAAR's board was expressly authorized to grant preferential voting rights to certain classes of stock.

### B.

Conceding that the Delaware certificate fails to expressly list voting rights among the preferences the Board is authorized to grant, the Waggoners nonetheless argue that one portion of STAAR's Delaware certificate contains the blanket authority sufficient to meet Delaware's statutory requirements. They point to the second paragraph of subsection (b), Article *FOURTH* which provides:

> *Except as otherwise required by statute or provided for by resolutions of the Board of Directors, as hereinafter set forth,* the holders of the Common Stock shall possess the exclusive right to vote for the election of directors and for all other corporate purposes.

(Emphasis added).

■■■ A certificate of incorporation is viewed as a contract among shareholders, and general rules of contract interpretation apply to its terms. *Rothschild Int'l Corp. v. Liggett Corp.,* Del.Supr., 474 A.2d 133, 136 (1984); *Wood v. Coastal States Gas Corp.,* Del.Supr., 401 A.2d 932, 937 (1979). Courts must give effect to the intent of the parties as revealed by the language of the certificate and the circumstances surrounding its creation and adoption. *Judah v. Delaware Trust Co.,* Del.Supr., 378 A.2d 624, 628 (1977); *Ellingwood v. Wolf's Head Oil Ref. Co.,* Del.Supr., 38 A.2d 743, 747 (1944). Since stock preferences are in derogation of the common law, they must be strictly construed. *Goldman v. Postal Telegraph Inc.,* 52 F.Supp. 763 (D.Del. 1943); *Barron v. Allied Artists Pictures Corp.,* Del.Ch., 337 A.2d 653 (1975), *appeal dismissed,* Del.Supr., 365 A.2d 136 (1976); *Holland v. National Automotive Fibres, Inc.,* Del.Ch., 194 A. 124 (1937); *Pennington v. Commonwealth Hotel Constr. Co.,* Del.Ch., 151 A. 228 (1930), *rev'd in part,* 155 A. 514 (1931); *Gaskill v. Gladys Bell Oil Co.,* Del.Ch., 146 A. 337 (1929). An express grant of authority to establish

stock preferences cannot be conferred by a general reservation clause worded in a nonspecific fashion. *Rothschild,* 474 A.2d at 136; *Gaskill,* 146 A. at 339.

In one of the earliest cases to address this issue, the Court of Chancery stated:

> The power to create preferred stock is granted in § 18 [of the certificate], and it is granted upon the terms set forth in that section. To enact that the stock should have such preference as is stated or expressed in the certificate was equivalent to enacting that it should have no other preferences upon the general principle of interpretation that the expression of one thing is the exclusion of another.

*Gaskill,* 146 A. at 339. Moreover, in *Gaskill* the court stated:

> It is elementary that the rights of stockholders are contract rights. The mere word "preferred" unless it is supplemented by a definition of its significance conveys no special meaning. The holder of preferred stock must therefore refer to the appropriate language of the corporate contract for the ascertainment of his rights. The nub of the present contention is—where may such appropriate language be found? The exceptants say in the certificate of incorporation and nowhere else. In this I think they are correct.

*Id.* Subsequently, numerous decisions applying Delaware law have followed *Gaskill* and adhered to the rule that stock preferences are to be strictly construed. *Goldman,* 52 F.Supp. at 767; *Barron,* 337 A.2d at 657 ("[P]references attaching to stock are the exception and are to be strictly construed."). *See also Holland,* 194 A. at 126–27 ("[N]othing should be presumed in their favor ... [I]f those preferences are stated in terms that are irreconcilable in their repugnancy, a case arises where the clearness necessary for the definition of preferences has not been satisfied."); *Pennington,* 151 A. at 234 ("The general rule is that preferred stock enjoys only those preferences which are specifically defined.... [B]efore such an exceptional right is recognized it ought to appear clearly that the parties have intended to create

it.''). *Cf. Penington,* 155 A. at 520 ("[C]laims for special preferences must be clearly provided by the charter contract."). We think those decisions clearly establish the rule that stock preferences are to be strictly construed in Delaware.[9] We adhere to that view.

Applying the rule of strict construction to the language urged by Waggoner, we find that it is merely a general reservation clause which is insufficient to expressly reserve authority in the board to establish preferences. Such general reservation clauses are commonly found in corporate documents, and we need not impose a strained construction to give the phrase different meaning. The clause is phrased in the negative, and is too general and nonspecific to confer the broad authority suggested by Waggoner. Moreover, the sentence contains the limitation "as hereinafter set forth" which appears to refer to the list of designations, powers, preferences and rights the board was authorized to confer. The power to establish voting rights was conspicuously absent from the enumerated rights and powers granted the board. While that omission may have been accidental, given the requirements of Delaware law this Court cannot presume so and thereafter supply the missing provisions. Under the rule of strict construction, any ambiguity must be resolved against granting the challenged preferences, rights or powers.

### C.

Waggoner next argues that extrinsic evidence of the intended terms of the certificate was sufficient to warrant its reformation, relying upon *In re Farm Industries, Inc.,* Del.Ch., 196 A.2d 582, 592 (1963). The trial court noted that this argument rested on "the highly dubious proposition that where a statute requires a grant of power to directors to be expressly stated in the certificate of incorporation and where that certificate contains no such express grant, this Court may resort to extrinsic evidence to supply the missing term by way of interpretation." *Laster,* slip op. at 33–34. Nevertheless, the trial court reviewed the extrinsic evidence and found it insufficient to support Waggoner's assertions.

 It is a basic principle of equity that the Court of Chancery has jurisdiction to reform a document to make it conform to the original intent of the parties. *Douglas v. Thrasher,* Del.Supr., 489 A.2d 422, 426 (1985); *Hob Tea Room, Inc. v. Miller,* Del.Supr., 89 A.2d 851, 856–57 (1952). That includes a certificate of incorporation. *In re Farm Industries, Inc.,* 196 A.2d at 592. In doing so, however, Chancery must consider the interests of any third parties affected by the reformation. *See Douglas,* 489 A.2d at 426; *In re Farm Industries, Inc.,* 196 A.2d at 592. Generally,

[r]eformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties.

---

9. The only suggestion to the contrary is found at 1 R. Balotti & J. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 5.3, at 209 (Supp.1989) (citing *Breech v. Hughes Tool Co.,* Del.Supr., 189 A.2d 428 (1963)); *In re Klingaman's Estate,* Del.Supr., 128 A.2d 311 (1957); and *Warner Co. v. Leedom Constr. Co.,* Del.Supr., 97 A.2d 884 (1953). None of those cases concern corporate statutes. Moreover, they have been superseded by more recent decisions following the rule that statutes in derogation of the common law are to be strictly construed. *See Gibson v. Keith,* Del. Supr., 492 A.2d 241 (1985); *State v. Brown,* Del.Supr., 195 A.2d 379 (1963); *DeJoseph v. Faraone,* Del.Super., 254 A.2d 257 (1969). This is consistent with the rule adopted by a majority of other jurisdictions. *See* 82 C.J.S. *Statutes* § 393, at 938 n. 43 (1953 & Supp.1989).

*Douglas,* 489 A.2d at 426 (quoting from 3 *Pomeroy's Equity Jurisprudence* § 870, (5th ed.)). *See also* 1 E. Folk, R. Ward & E. Welch, *Folk on the Delaware General Corporation Law* § 151.4, at 218 (1988) (suggesting two requirements for reformation in this context: (i) it must be clear that all present and past shareholders intended certain voting provisions to be included within the certificate, and (ii) there must not be *any* intervening third party interest). Thus, where a lawyer failed to delineate the voting rights of particular classes of stock in a certificate of incorporation was clearly contrary to the intentions of the parties and no third-party interest was involved, the Court of Chancery correctly reformed the certificate to reflect their intent. *In re Farm Industries, Inc.,* 196 A.2d at 590–02.

That was not the case here. The extrinsic evidence centered on Proposal 2 presented to stockholders at the annual meeting on March 17, 1986. The testimony was equivocal on the critical question of whether Proposal 2 was actually adopted by the stockholders. Even if it had been approved, however, it is unclear whether it was meant to apply to the California or Delaware certificate. There were substantive differences between Proposal 2 and the actual terms of the Delaware certificate. The "Except" clause discussed above was added to the Delaware certificate and the reference to voting rights in the list of authorized preferences was deleted from that certificate. Again, there was conflicting evidence on whether Lutzker meant to insert voting rights among the list of enumerated rights and powers that could be granted to the preferred stock. Although he originally testified that the new Delaware certificate was correct as originally filed, but he later filed a certificate of correction with the Delaware Secretary of State to cure the problem raised by this litigation. Given its timing, that correction understandably carries little weight.

The evidence presented to the trial court was conflicting. The Vice Chancellor had to evaluate its weight and credibility. Based upon our standard of review, it is apparent that trial court's factual findings are supported by the record and reflect an orderly and logical deductive reasoning process. Accordingly, they stand.

## IV.

■ Finally, Waggoner argues that the doctrine of estoppel should prevent the appellees from objecting to the validity of the preferred stock's super-majority voting rights. Waggoner contends that he was induced to provide personal guarantees and stock pledges in exchange for super-majority voting preferred stock, and that until this lawsuit was filed, his super-majority voting power was never challenged. The appellees maintain that Waggoner failed to establish the necessary factual elements for estoppel, and that as a matter of law even if such facts were established, there can be no estoppel to challenge the void act of creating super-majority voting rights.

■ The doctrine of equitable estoppel may be invoked "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." *Wilson v. American Ins. Co.,* Del.Supr., 209 A.2d 902, 903–04 (1965). To establish estoppel it must be shown that the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; relied on the conduct of the party against whom estoppel is claimed; and suffered a prejudicial change of position as a result of his reliance. *Id.* In the corporate context, estoppel has often been used to prevent a stockholder from objecting to the validity of stock which he accepted with knowledge of the irregularities or infirmities in issuing it. 11 W. Fletcher, *The Law of Professional Corporations* § 5169, at 353–54 (Rev. ed. 1986); *Trounstine v. Remington Rand, Inc.,* Del. Ch., 194 A. 95, 99 (1937) (plaintiff who objected to the reclassification of his preferred stock but nevertheless tendered his shares into exchange estopped to deny validity of the reclassification). Estoppel has also been applied in cases where a stockholder, with knowledge of the facts, consents or acquiesces in the acts of directors

or other corporate officers. 12A W. Fletcher, *The Law of Professional Corporations* § 5862 at 295 (Rev. ed. 1986). *See also Gottlieb v. McKee*, Del.Ch., 107 A.2d 240, 244 (1954) (plaintiff who granted general proxy to management was not estopped from objecting to vote on resolution not mentioned in proxy statement and of which she had no knowledge).

Estoppel, however, has no application in cases where the corporation lacks the inherent power to issue certain stock or where the corporate contract or action approved by the directors or stockholders is illegal or void. 11 Fletcher, § 5169, at 354–55 (stock); 12A Fletcher, § 5862, at 295 (corporate contract or action). *See also* Annotation, *Purchaser's Right to Set Up Invalidity of Contract Because of Violation of State Securities Regulation as Affected by the Doctrines of Estoppel or Pari Delicto*, 84 A.L.R.2d 479, 483 (1962, 1979, & Supp.1990) ("As a general proposition, it has been held that the doctrine of estoppel has no application to an agreement or instrument which is illegal because it violates an express mandate of law or the dictates of public policy."). That rule is recognized in Delaware. In *Triplex Shoe Co. v. Rice & Hutchins, Inc.*, Del.Supr., 152 A. 342, 347–48 (1930), this Court considered whether an amendment to the certificate of incorporation authorizing an exchange of shares could validate previously-issued and illegal no par value stock. It stated:

> We are unable to see how the amendment could have made stock valid that was void because issued without any authority from the State. Such an amendment might cure certain irregularities, imperfections, and defects in a stock issue that is authorized ..., but it does not seem to us that it can possibly relate back and validate a stock that was issued without any corporate authority. If the stock issue was void, a nullity, there was

nothing to validate, nothing upon which the amendment could operate.

*Id.* at 347–48.

Waggoner argues that *Triplex* should be limited on its facts to cases involving illegal issuances of stock and should not be extended to deny estoppel for other corporate actions such as the granting of super-majority voting rights. We see no logical basis for adopting such a limitation as a matter of law. The Court of Chancery has assumed without deciding in separate actions that the issuance of preferred stock to Waggoner was valid, *Waggoner v. STAAR Surgical Co.*, Del.Ch., C.A. No. 11185, Jacobs, V.C., at 14 fn. 7 (Mar. 15, 1990), but that the board was not authorized to endow the preferred stock with super-majority voting rights, *Laster*, slip op. at 37. The former determination is now before us in a separate appeal. However, there is no inconsistency as a matter of law to deny the Waggoners an estoppel as to the validity of super-majority voting rights even if the stock to which they were purportedly attached may otherwise have been validly issued. We thus reject Waggoner's claim of estoppel as a matter of law in light of the trial court's legal and factual determination that the preferred stock's super-majority voting rights were void.[10]

## V.

In this action, the Court of Chancery assumed that Waggoner had been issued preferred stock with super-majority voting rights, but it nevertheless concluded that such voting rights were void because the Board lacked authority under STAAR's certificate of incorporation to authorize preferred stock with such special rights. We uphold that determination because the power to establish special voting rights is conspicuously absent from the list of preferences the Board was authorized to confer. No other provision of STAAR's certificate clearly grants the Board such authority. Moreover, the trial court's determination that the extrinsic evidence presented by

---

**10.** This legal conclusion makes it unnecessary for us to reach the factual question of whether the elements of estoppel have been met, but we note that the record suggests substantial questions concerning the Waggoners' lack of knowledge and reliance.

Waggoner was insufficient to reform the certificate is a logical conclusion supported by the record. Under these circumstances, there is no estoppel to challenge the validity of a void act. The judgment of the Court of Chancery is AFFIRMED.