# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VEERASITH SINCHAREONKUL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 10543-VCL |
| | ) | |
| THOMAS FAHNEMANN, RICHARD | ) | |
| EHRENFELDNER, GERHARD | ) | |
| KLINGENBRUNNER, and CLEMENS | ) | |
| EICHLER, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Submitted: January 20, 2015
Decided: January 22, 2015

A. Thompson Bayliss, Steven C. Hough, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Attorneys for Plaintiff.*

Samuel A. Nolen, Kevin M. Gallagher, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants.*

**LASTER, Vice Chancellor.**

The plaintiff is a director of non-party Sempermed USA, Inc. ("SUSA" or the "Company"), a Delaware corporation. He seeks declaratory judgments invalidating two bylaws that confer disproportionate voting power on the defendants, who are also directors of the Company. He seeks a third declaratory judgment invalidating a resolution adopted by the defendants through the exercise of their disproportionate voting powers. He has moved to schedule an expedited hearing on an application for a preliminary injunction, which he asks to be heard before February 10, 2015. Although the plaintiff has stated a colorable claim, he has not identified a sufficient threat of irreparable harm to warrant an immediate injunction hearing. Instead, good cause exists for a two-day trial in approximately 90-120 days so that a final decree can be entered.

## I.  FACTUAL BACKGROUND

The operative facts are drawn from the complaint and the documents it incorporates by reference. "In assessing a motion to expedite, the Court need not—and, indeed, should not—make factual findings. It is, instead, guided by the well-pled, verified allegations of the Complaint." *Shocking Techs., Inc. v. Michael*, 2012 WL 165561, at *1 (Del. Ch. Jan. 10, 2012). At this procedural stage, the plaintiff receives the benefit of all reasonably conceivable inferences.[1] Certain seemingly non-controversial background facts have been drawn from a declaration provided by defendant Clemens Eichler.

---

[1]"[T]he standard for expedition, colorability, which simply implies a non-frivolous set of issues, is even lower that the 'conceivability' standard applied on a motion to dismiss." *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *1 n.1 (Del. Ch. Oct. 16, 2013). "In considering a motion to dismiss . . . the Court takes the well-pleaded allegations of the complaint as true and affords the plaintiff the benefit of all reasonable inferences that can be drawn from

## A.    The Company

Semperit Technische Produkte Gesellschaft m. b. H. ("Semperit"), Sri Trang Agro-Industry Public Co., Ltd. ("Sri Trang"), and Siam Sempermed Corporation Ltd. ("Siam Sempermed") agreed to form the Company in 1998 for the purposes of manufacturing latex surgical gloves and then distributing and selling them in the United States market. Each of the stockholders brought business expertise to the venture. Semperit is a world-wide manufacturer, producer, and distributor of specialized rubber-based products. Its medical products include a wide range of examination, protective, and surgical gloves, which it distributes under several brands, including the SEMPERMED trademark. Sri Trang has experience sourcing field latex and manufacturing latex concentrate and other rubber products. Siam Sempermed manufactures latex gloves.

To document their business relationship, Semperit, Sri Tang, and Siam Sempermed entered into a Joint Venture Agreement dated April 30, 1998 (the "JV Agreement" or "JVA"). The JV Agreement called for SUSA's formation as a Delaware corporation. It contemplated that SUSA would have an eight member board of directors (the "Board"), evenly split between nominees of Semperit and Sri Trang. JVA § 6.1. To avoid deadlock, it provided as follows:

> The chairman of the board of directors shall be elected out of the four (4) directors nominated by Semperit and shall have a casting vote. Therefore, if no majority can be obtained within the board of directors on any such issue

those allegations." *Shamrock Activist Value Fund, L.P. v. iPass Inc.*, 2006 WL 3824882, at *1 (Del. Ch. Dec. 15, 2006). *A fortiori*, at least the the same plaintiff-friendly standard, if not a somewhat more plaintiff-friendly standard, should apply to a motion to expedite.

2

or resolution, the chairman of the board of directors shall have a second vote. However, the chairman of the board of directors shall have no casting (tie breaking vote) vote in the matters described in Article 6.4 (7), (9) and (18) hereof.[2]

Embracing the language of the provision, this decision refers to the tiebreaking vote allocated to the chairman as the "Casting Vote."

The JV Agreement acknowledged that the Company would have a certificate of incorporation and bylaws, but provided that "[i]n the event that any conflict or discrepancy arises between such Certificate of Incorporation and this Agreement, the provisions of the latter [*i.e.*, the JV Agreement] shall prevail and the Certificate of Incorporation shall be promptly amended accordingly." JVA § 3.2. The JV Agreement also provided for mandatory arbitration of any disputes between the parties:

> Any dispute between the parties under and in connection with this Agreement shall be decided by three arbitrators appointed under the Rules of Conciliation and Arbitration of the International Chamber of Commerce in Paris. The place of Arbitration shall be Zürich, Switzerland, the language of the arbitration proceeding shall be English. Documentary evidence may be submitted in a different language, unless the arbitration tribunal requests the submitting party to submit a translation thereof. The arbitral award shall determine the liability of the parties as to the costs of the arbitration, including reasonable attorneys, [*sic*] fees incurred by the parties. Judgment upon the award may be entered in any court having jurisdiction or application may be made to such court for a judicial acceptance of the award and for an order of enforcement, as the case may be.

---

[2] JVA § 6.3 (footnote added). Sections (7), (9) and (18) of Article 6.4 are not applicable here. *See id.* § 6.4(7) (addressing the "entry into any new business requiring investment in excess of 20% of [the Company's] capital per project or the abandonment of an existing line of business"); § 6.4(9) (addressing the "mortgage or disposal of properties or assets of [the Company] exceeding per transaction 10% of [the Company's] capital"); § 6.4(18) (addressing "any modification of the Rules of management (Art. 7.3)").

JVA § 20.2.

SUSA's certificate of incorporation (the "Charter") and its bylaws implemented the JV Agreement's governance scheme imperfectly. Under the Charter, SUSA's authorized capitalization consists of 4,000 shares of common stock divided into three series: 2,000 shares of Series A common stock, 1,000 shares of Series B common stock, and 1,000 shares of Series C common stock. Siam Sempermed owns the Series A common stock, Sri Trang owns the Series B common stock, and Semperit owns the Series C common stock. As contemplated by the JV Agreement, the Charter fixes the number of directors at eight, with four elected by the holders of the Series B common stock and four elected by the holders of the Series C common stock. Charter Arts. FOURTH C.3 and SEVENTH. For simplicity, this decision refers to the directors elected by the holders of the Series B common stock as the "Sri Trang Directors" and the directors elected by the holders of the Series C common stock as the "Semperit Directors."

The Charter does not provide for the chairman to be designated from among Semperit Directors, nor does it grant the chairman the Casting Vote. These provisions appear in the bylaws. Article III, § 11 of the bylaws states:

> ***Chairman of the Board.*** The chairman of the board shall be elected by the board from among the four (4) directors elected by [Semperit]. The chairman thus elected shall cast the deciding vote in the event of a deadlock of the board of directors in respect of any issue submitted to the board or that is subject to board approval or that for any reason requires board approval.

4

This decision refers to the portion of this provision addressing the election of the chairman as the "Chairman Election Bylaw." It refers to the portion allocating the Casting Vote to the chairman as the "Casting Vote Bylaw."

**B.     The Royalty Resolution**

Also as contemplated by the JV Agreement, Semperit and the Company executed the STP Trademark and Name Licensing Agreement (the "Licensing Agreement" or "LA"), pursuant to which Semperit granted a non-exclusive, non-transferable license to the Company to use Semperit's trademark "to sell or distribute gloves bearing the Trademark . . . in the United States of America" on certain conditions. *See* LA, Art. 2 § 1. The Licensing Agreement has a term of one year, but renews automatically for additional one-year terms unless terminated by either party giving six months notice. *Id.*, Art. 7, § 1. To date, neither party has terminated the Licensing Agreement.

For the first year, the annual royalty under the Licensing Agreement was $10. *Id.*, Art. 2, § 2. The Licensing Agreement provided that "[i]f the term of this agreement is extended by the mutual agreement of the parties, the annual royalty payment shall be adjusted to fair market value." *Id*.

From the date of its execution until October 2014, the Licensing Agreement renewed automatically. In October 2014, Semperit determined that it was time to adjust the royalty payment to "fair market value." At the Company's October 23, 2014 meeting of the Board, a vote was held on the retention of VLF Consulting, Inc. ("VLF"), a trademark valuation firm, to determine the fair market value of the royalty payment. The Semperit Directors voted in favor of the resolution. The Sri Trang Directors purported to

5

vote by proxy against the resolution. To avoid any argument that the vote was deadlocked, the Chairman of the Board, defendant Thomas Fahnemann, exercised the Casting Vote in favor of the resolution. The complaint concedes that the Sri Trang Directors could not vote by proxy under Delaware law, making their opposition ineffective even without the Casting Vote.

On December 12, 2014, VLF issued its Evaluation of Appropriate Royalties under Sempermed USA's Licensing Agreement (the "Valuation Report"). VLF determined that the fair market value of the SEMPERMED trademark called for a royalty equal to 2.0% of net sales. In 2013, SUSA had net sales of $150 million, implying a royalty of $3 million.

The Board met again on January 13, 2015. A vote was held on a resolution to amend the royalty payment to 1.75% of the Company's net sales beginning May 2015— less than the 2% royalty contemplated by the Valuation Report (the "Royalty Resolution"). The Semperit Directors voted in favor of the Royalty Resolution. The Sri Trang Directors voted against the Royalty Resolution. Chairman Fahnemann exercised the Casting Vote in favor of the Royalty Resolution.

## C.    This Litigation

On January 14, 2015, plaintiff Veerasith Sinchareonkul filed suit against the Semperit Directors. The plaintiff is a Sri Trang Director. He is also a director of Sri Trang itself and a major stockholder of Sri Trang. He is the son of Dr. Viyavood Sincharoenkul, who is the chairman, chief executive officer, managing director and a major stockholder of Sri Trang.

6

The complaint contains three counts. Count I seeks a declaratory judgment that the Casting Vote Bylaw is void. Count II seeks a declaratory judgment that the Chairman Election Bylaw is void. Count II also seeks a declaratory judgment that because the Chairman Election Bylaw is void, Fahnemann has not been elected as chairman and does not hold that office. Count III seeks a declaratory judgment that the Royalty Resolution is void because its adoption depended on the validity of the Casting Vote.

## D.     The Proposed Charter Amendment

On January 19, 2015, after the filing of this lawsuit, the Semperit Directors noticed a meeting of the Board for February 10, 2015. At the meeting, the Board will consider an amendment to the Charter to incorporate the provisions regarding the designation of the Chairman and the Casting Vote in that document, thereby conforming its terms to the JV Agreement (the "Proposed Amendment"). The resolution adopting the Proposed Amendment calls for a meeting of stockholders to be held on February 27, 2015, so that SUSA's stockholders may vote on the Proposed Amendment. The Semperit Directors argue that if the Sri Trang Directors fail to vote in favor of the Proposed Amendment, or if Sri Trang fails to vote in favor of it at the stockholder meeting, then a dispute will exist under the JV Agreement that must be decided by arbitration.

## II.     LEGAL ANALYSIS

"Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 399 (Del. 1997). The Court of Chancery Rules give the court broad discretion to accelerate the pace of proceedings. *See, e.g.,* Ct. Ch. R. 12(a) (authorizing shortened time to answer complaint)

7

Ct. Ch. R. 30(a) (authorizing expedited depositions); Ct. Ch. R. 33(b)(3) (authorizing expedited responses to interrogatories); Ct. Ch. R. 34 (b) (authorizing expedited responses to requests for production). When a party like the plaintiff seeks a declaratory judgment, Rule 57 authorizes the court to "order a speedy hearing." Ct. Ch. R. 57.

If a plaintiff wishes to apply for a preliminary injunction, then the plaintiff must make a colorable showing that the hearing is warranted. Such a hearing will be scheduled only if "the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial) costs of an expedited preliminary injunction proceeding." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994) (Allen, C.). This two-part test is a specific application of the general standard that a proceeding will be accelerated upon a showing of good cause: "This Court does not set matters for an expedited hearing or permit expedited discovery unless there is a showing of good cause why that is necessary." *Greenfield v. Caporella*, 1986 WL 13977, at *2 (Del. Ch. Dec. 3, 1986). "To successfully earn expedition, the movant must show good cause why it is necessary to impose upon the counterparty and the Court these substantially increased burdens of time, effort, and expense." *In re Yahoo! Inc. S'holders Litig.*, 2008 WL 2627851, at *1 (Del. Ch. June 16, 2008).

The plaintiff in this case has asked the court to issue three declaratory judgments. In addition, the plaintiff has asked the court to schedule a hearing on a preliminary injunction that would bar the defendants from exercising the Casting Vote or implementing the Royalty Resolution pending a final decision on the merits. Because the

8

plaintiff has asked for an expedited hearing on a preliminary injunction, the two-part *Snapple* framework provides an appropriate rubric for analyzing the motion.

## A.    Standing

As a threshold matter, the defendants argue that the plaintiff lacks standing to file suit. To establish standing to sue, a plaintiff must demonstrate that (i) he suffered an injury in fact, (ii) there is a causal connection between the injury and the conduct complained of, and (iii) the injury will likely be redressed by a favorable decision. *In re Celera Corp. S'holder Litig.,* 59 A.3d 418, 429 (Del. 2012). All three elements are met.

An individual who serves as a director of a Delaware corporation possesses certain rights. *See generally* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33 (2015). One obvious and familiar right is a director's ability to obtain information about the corporation she serves.[3] But perhaps the most fundamental right is the ability to participate in the board's collective deliberations and any resulting exercise of its power and authority over the business and affairs of the

---

[3] *See* 8 *Del. C.* § 220(d); *Schoon v. Troy Corp.*, 2006 WL 1851481, at *1 n.8 (Del. Ch. June 27, 2006) (noting that a director's right to information is "essentially unfettered in nature" (quoting *Milstein v. DEC Ins. Brokerage Corp.*, C.A. Nos. 17586, 17587, at 3 (Del. Ch. Feb. 1, 2000) (TRANSCRIPT)); *Intrieri v. Avatex*, 1998 WL 326608, at *1 (Del. Ch. June 12, 1998) (same); *Belloise v. Health Mgmt., Inc.*, 1996 Del. Ch. LEXIS 127, at *36 (Del. Ch. June 11, 1996) (Allen, C.) (same); *see also Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at *5 (Del. Ch. June 4, 1996) (explaining that the director's right to information includes "equal access to 'board information'"); *Hall v. Search Capital Gp., Inc.*, 1996 WL 696921, at *2 (Del. Ch. Nov.15, 1996) (noting that a company "cannot pick and choose which directors will receive [which] information").

corporation.[4] If one or more other directors interfere with or deny a director's rights, then the director has suffered injury and has standing to sue. *See Kalisman v. Friedman,* 2013 WL 1668205, at *7 (Del. Ch. Apr. 17, 2013) (holding that director had standing to sue where director had been denied access to information and the opportunity to participate in board deliberations on an equal basis with other directors).

Valid board action rests on the premise that the matter in question has received affirmative votes from a requisite majority of directors voting on a subject at a meeting at which a quorum is present. 8 *Del. C.* §141(b). A essential premise for valid board action is that each director has only exercised that degree of voting power to which she is lawfully entitled. If a director has purported to exercise greater voting power, then that director has placed a thumb on the scales and exercised disproportionate influence over the outcome, to the detriment of other directors who have had their right to participate and the value of their votes diminished. The latter directors have been injured and have standing to sue, just as stockholders who have had their voting power diluted suffer an individual injury and can sue directly.[5]

---

[4] *See* 8 *Del C.* §141(a); *McMullin v. Beran,* 765 A.2d 910, 916 (Del. 2000) ("One of the fundamental principles of the Delaware General Corporation Law statute is that the business affairs of a corporation are managed by or under the direction of its board of directors." (citing 8 *Del. C.* § 141(a)); *Lippman v. Kehoe Stenograph Co.,* 95 A. 895, 899 (Del. Ch. 1915) ("Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered.").

[5] *See Gentile v. Rossette,* 906 A.2d 91, 99-100 (Del. 2006) (explaining that claims alleging equity dilution can be direct or derivative and that claim for dilution of voting power is direct); *accord Loral Space & Commc'ns Inc. v. Highland Crusader Offshore P'rs, L.P.,* 977 A.2d 867, 868-69 (Del. 2009); *Gatz v. Ponsoldt,* 925 A.2d 1265, 1274 (Del. 2007).

Citing *Roven v. Cotter*, 547 A.2d 603 (Del. Ch. 1988), the defendants correctly observe that a director who can be removed from office has no vested right to continue serving as a director. From this proposition, the defendants make the unjustified leap to positing that a director has no subsidiary right to exercise the particular powers of his office while serving as a director, such that any claim for interference with his rights must be asserted derivatively by a stockholder. In my view, an individual who is serving as a director has an interest in having her rights respected and can sue to enforce them.

**B.    A Colorable Claim**

Each of the three counts of the complaint turns on whether the bylaws can confer greater voting power on a particular director or group of directors. In all three cases, the plaintiff has articulated a colorable claim.

When assessing challenges to corporate acts, Delaware law distinguishes between arguments that the act is not legally permissible and arguments that it was inequitable under the circumstances presented for those in control of the corporation to take otherwise legally permissible action. The corporate scholar and statesman Adolf A. Berle highlighted the distinction, explaining that

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que* trust to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.

11

Adolf A. Berle, *Corporate Powers As Powers In Trust*, 44 Harv. L. Rev. 1049, 1049 (1931). Delaware adheres to the twice-testing principle.[6]

When evaluating corporate action for legal compliance, a court examines whether the action contravenes the entity-specific corporate contract. The components of that contract form a hierarchy, comprising from top to bottom (i) the Delaware General Corporation Law (the "DGCL"), (ii) the certificate of incorporation, and (iii) the bylaws.[7] Each of the lower components of the contractual hierarchy must conform to the higher components. A bylaw that conflicts with the charter is void, as is a bylaw or charter provision that conflicts with the DGCL.

When analyzing the validity of a bylaw, the starting point is Section 109(b) of the DGCL, which specifies what bylaws can address. It states:

---

[6] *Sample v. Morgan*, 914 A.2d 647, 673 (Del. Ch. 2007) (Strine, V.C.) (explaining that corporate acts are "'twice-tested'—once by the law and again by equity."); *accord Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 641 (Del. Ch. 2013) ("Corporate acts are 'twice-tested,' once for statutory compliance and again in equity."); *see Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) ("A reviewing court's role is to ensure that the corporation complied with the statute and acted in accordance with its fiduciary duties.").

[7] *See Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders."); *accord Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders . . . ."); *STAAR Surgical Co. v. Waggoner,* 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders."); *Centaur P'rs, IV v. Nat'l Intergroup, Inc.,* 582 A.2d 923, 928 (Del. 1990) ("Corporate charters and by-laws are contracts among the shareholders of a corporation . . . ."); *see also Fed. United Corp. v. Havender*, 11 A.2d 331, 333 (Del. 1940) ("It is elementary that [the Delaware General Corporation Law's] provisions are written into every corporate charter.").

> The bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees.

8 *Del. C.* § 109(b). Two aspects of Section 109(b) immediately jump out. The first is its breadth. The range of subjects that a bylaw can address is expansive, including anything "relating to . . . the rights or powers of its . . . directors." By this metric, a provision like the Casting Vote Bylaw or the Chair Election Bylaw would seem to fall within the types of bylaws authorized by Section 109(b). *Cf. ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014) (observing that "[a] bylaw that allocates risk among parties in intra-corporate litigation would also appear to satisfy the [Section 109(b)'s] requirement that bylaws must 'relat[e] to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees.'").

But a second aspect of Section 109(b) is equally important. By its terms, Section 109(b) builds into the analysis of a bylaw's validity the hierarchy of corporate documents. Although the hierarchy would apply regardless, Section 109(b) eliminates any possible doubt by specifying that a bylaw must not be "inconsistent with law or with the certificate of incorporation." Section 394 of the DGCL provides that "[t]his chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation." 8 *Del. C.* § 394. For purposes of a evaluating the statutory validity of a bylaw, therefore, it is not enough to measure it only against the "relating to" language of Section 109(b). It is also necessary to consider what other sections of the DGCL say

13

about the matter. *Cf. ATP Tour,* 91 A.3d at 558 n.16 (considering whether bylaw conflicted with 8 *Del. C.* § 102(a), which specifies the mandatory contents of the certificate of incorporation).

Section 141(d) of the DGCL addresses the possibility of a subset of directors holding different or greater voting rights than other directors. It states:

> The certificate of incorporation may confer upon holders of any class or series of stock the right to elect 1 or more directors who shall serve for such term, and have such voting powers as shall be stated in the certificate of incorporation. The terms of office and voting powers of the directors elected separately by the holders of any class or series of stock may be greater than or less than those of any other director or class of directors. In addition, the certificate of incorporation may confer upon 1 or more directors, whether or not elected separately by the holders of any class or series of stock, voting powers greater than or less than those of other directors. Any such provision conferring greater or lesser voting power shall apply to voting in any committee or subcommittee, unless otherwise provided in the certificate of incorporation or bylaws. If the certificate of incorporation provides that 1 or more directors shall have more or less than 1 vote per director on any matter, every reference in this chapter to a majority or other proportion of the directors shall refer to a majority or other proportion of the votes of the directors.

8 *Del. C.* § 141(d). Notably, whenever this passage speaks about differential voting powers for directors, it refers to the different voting powers being set forth the certificate of incorporation. "The plain, unambiguous meaning of the quoted language is that if one category or group of directors is given distinctive voting rights not shared by the other directors, those distinctive voting rights must be set forth in the certificate of incorporation." *Carmody v. Toll Bros.*, 723 A.2d 1180, 1191 (Del. Ch. 1998). The specific reference to the certificate of incorporation is "a 'bylaw excluder,' in the sense that those words make clear that the specific grant of authority in that particular statute is

14

one that can be varied only by charter and therefore indisputably not one that can be altered by a § 109(b) bylaw." *Jones Apparel Gp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 848 (Del. Ch. 2004).

Under Section 141(d), "[t]he certificate of incorporation" may grant the holders of a particular series of stock, such as SUSA's Class C common stock, the right to elect one or more directors, such as the Semperit Directors, and the designated directors may "have such voting powers as shall be stated in the certificate of incorporation." Section 141(b) does not authorize a provision conferring differential voting rights on directors to appear in the bylaws; it must appear in the certificate of incorporation. Under Section 109(b), a bylaw that conflicts with the DGCL is void. 8 *Del. C.* § 109(b); *accord ATP Tour*, 91 A.3d at 557-58 ("[A] bylaw must be authorized by the [DGCL], consistent with the corporation's certificate of incorporation, and its enactment must not be otherwise prohibited." (footnotes omitted)); *Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 398 (Del. 2010) ("[A] bylaw provision that conflicts with the DGCL is void.").

The Casting Vote Bylaw and the Chairman Election Bylaw both run afoul of these principles. The plaintiff has stated a colorable claim that the Casting Vote Bylaw and the Chairman Election Bylaw are void, and that the Royalty Resolution adopted in reliance on these bylaws is therefore also void.

In response to the plaintiff's claim, the defendants did not offer much in the way of statutory analysis. They argued instead that it is inequitable for a party to have agreed to a governance scheme in an overarching agreement like the JV Agreement, then to invoke what the defendants regard as legal technicalities in an effort to escape a

15

fundamental feature of that regime. There is authority indicating that a court cannot credit equitable defenses to validate a void act. *See STAAR Surgical*, 588 A.2d at 1137; *Waggoner v. Laster*, 581 A.2d 1127, 1137 (Del. 1990). But on the current record and at this procedural stage, the defendants' arguments cannot be evaluated thoroughly. It suffices for present purposes to find that the plaintiff has stated a colorable claim.

## C.     Irreparable Harm

The second requirement for the scheduling of an expedited hearing on an application for a preliminary injunction is a showing of irreparable harm. The plaintiff primarily alleges that he faces a threat of irreparable harm and requires an imminent hearing because the defendants may rely on the Casting Provision to cause the Board to approve the Proposed Amendment on February 10, 2015. The Proposed Amendment, however, only can go into effect if it receives both Board approval on February 10 and stockholder approval on February 27. If Sri Trang votes against the proposal, then Semperit will be forced to commence arbitration in an effort to compel Sri Trang to comply with the JV Agreement and revise the Charter. It seems highly unlikely that the arbitration will be completed within a matter of weeks. The prospect for an arbitrator being able to resolve this dispute promptly becomes more remote given that the plaintiff and the other Sri Trang Directors are not parties to the JV Agreement. The plaintiff has indicated that he and his fellow Sri Trang Directors will dispute the ability of an arbitrator to order them act as directors to approve the Proposed Amendment. As the plaintiff sees it, the arbitrator might be able to order Sri Trang to vote in favor of the Proposed Amendment as a stockholder, but the arbitrator cannot compel the Sri Trang

16

Directors to act as directors. That issue is obviously for the arbitrator to decide, and perhaps there are other remedies that could be imposed. It is enough for now to note that this issue complicates the arbitration, making it unlikely that the exercise of the Casting Vote on February 10 would result in irreparable harm

The plaintiff also alleges that because the Semperit Directors have taken action in reliance on bylaw provisions that appear on their face to be statutorily invalid, his voting rights as a director have been infringed, resulting in irreparable harm. Any infringement of the plaintiff's voting rights in connection with the Royalty Resolution has already happened. That vote has occurred, and there is nothing for this court to enjoin. That does not mean that the injury cannot be remedied. The Royalty Resolution could be invalidated or the subject of permanent injunctive relief, but both forms of relief are more appropriately considered as part of a final decree crafted after a trial on the merits, not based on a preliminary record. *See C & J Energy Servs., Inc. v. City of Miami Gen. Empls.',* 2014 WL 7243153, at *17 (Del. Dec. 19, 2014) ("To issue a mandatory injunction . . . the Court of Chancery must either hold a trial and make findings of fact, or base an injunction solely on undisputed facts.").

Admittedly, part of the Royalty Resolution remains prospective. The resolution provided that the royalty would not go into effect until May 2015, so it would be possible for the court to enjoin the defendants preliminarily from carrying out the Royalty Resolution. Any harm from the payment of royalties, however, can be remedied by money damages, and the prospect of that harm remains four months away.

17

Under the circumstances, there is not a sufficient threat of irreparable harm to warrant scheduling a preliminary injunction hearing before February 10, 2015. Good cause does exist, however, for a "speedy hearing" in the form of a two-day trial on the merits in approximately 90-120 days. Ct. Ch. R. 57. That schedule will allow the parties to develop a factual record and brief the legal issues presented by the case thoroughly. After a trial on the merits, the court will be able to rule definitively on the validity of the two bylaws and the Royalty Resolution under the Company's current constitutive documents. If the defendants prevail, this court's decision will moot the need for the arbitration. If the plaintiff prevails, this court's decision will help frame the issues for arbitration, so that the parties will know whether they need to seek relief from the arbitrator that would operate at both the Board and stockholder levels.

## III.     CONCLUSION

The motion to expedite is granted in part and denied in part. The court will not schedule a hearing on an application for a preliminary injunction. The case will proceed to a two-day trial on the merits in approximately 90-120 days. The parties will confer and submit a scheduling order.

18