Dear Mr. Chastain:
In accordance with the provisions of the Louisiana Economic Development and Gaming Corporation Act, La. R.S. 4:601, et seq. (the "Act"), the Louisiana Economic Development and Gaming Corporation (the "Corporation") issued a request for proposals (the "RFP") in order to select a casino gaming operator. Two responses were received, one from Grand Palais Casino, Inc. ("GPCI"), the other from Harrah's Jazz Company ("HJC").
You requested opinions of the Attorney General concerning the limited questions of whether certain specified portions of the proposals made to the Corporation by both GPCI and HJC are legal and valid. The two requests have been consolidated into this response. Your question is would the Corporation be in violation of the Act or Article VII, Section 6 of the Louisiana Constitution, if it were to enter into either of the agreements described hereinafter?
Based upon the information provided, it is the opinion of this office that portions of the proposals submitted by both GPCI and HJC are violative of the Act and the Louisiana Constitution.
PROPOSAL OF GPCI
The first bid to be considered herein is that submitted by GPCI which provides, in part, that GPCI will advance to the State $200 million under specific terms and conditions. The terms and conditions are set forth on an "Advance Payment Term Sheet" which states that the advance will be made 30 days following commencement of operation of the Temporary Casino. Furthermore, "the advance, and interest payable thereon would be repaid from a portion of the State Win Fee earned by the State during operation of the Temporary Casino and during the first twenty-four months of operation of the Grand Palais Casino" (emphasis added). While the Temporary Casino is operational, the advance and interest is to be repaid in monthly increments, 50% of the win fee being first allocated to pay interest on the outstanding advance, then to repay the advance. Upon commencement of operations of the Casino, the outstanding advances will be calculated and they "will be repaid and interest thereon paid through 24 equal `payments' (the `Advance Payments') which will be made by Grand Palais reducing the State Win Fee each month by the amount of the Advance Payment" (emphasis added).
The proposal is contingent upon (i) the funding of the advance occurring thirty days after commencement of operations of the Temporary Casino; (ii) establishment of a mechanism for deposit of the win fees with a trustee who would apportion the funds due to the State and funds required to make payments on the advances and the interest owed thereon; and (iii) the favorable resolution of any lawsuits challenging the legality of the Temporary Casino or the Grand Palais or GPCI's right to operate them.
If in any month 50% of the state win fee is less than the interest payable on Advances Outstanding, the State may elect to (i) use additional state win fees to pay interest; or (ii) have the interest shortfall added to Advances Outstanding.
In order to respond to your request, we first must determine the nature of the Corporation. The Act specifically declares that, except for certain specific purposes, the Corporation "shall not be a state agency". La. R.S. 4:604. The Act defines the Corporation to be "a special corporation operated for a public purpose, the ownership interest of which is vested in the state". La. R.S. 4:605(7). The Act creates the Corporation as a "special corporation to be operated for a public purpose". La. R.S. 4:610(A). Based upon the foregoing, it would appear that the legislature has expressly chosen not to make the Corporation a part of state government; however, it must be recognized that in the consolidated matters entitled Reily v. Edwards and Polk v. Edwards, the 19th Judicial District Court, the Honorable Judge Carl A. Guidry presiding, found that the Corporation is a state instrumentality for purposes of that section of the Act which provides that the Corporation need not comply with civil service laws. The finding of unconstitutionality of that section of the Act is presently on appeal before the Louisiana Supreme Court.
The second issue to be addressed is the nature of GPCI's response to the RFP. The Advance Term Sheet categorizes the $200 million as an "advance" but uses the terms "repaid", "pay", "repay" several times. An "advance" is defined in Black's Law Dictionary to mean:
 "to pay money or render other value before it is due; to furnish something before an equivalent is received; to loan; to furnish capital in aid of a projected enterprise, in expectation of return from it, . . . to furnish money for a specific purpose understood between the parties, the money or sum equivalent to be returned; furnishing money or goods for others in expectation of reimbursement; money or commodities furnished on credit; a loan, or gift or money advanced to be repaid conditionally . . ."
An "advance" ordinarily implies a loan. B.J. Carney Co. v. Murphy, 68 Idaho 376, 195 P.2d 339 (1948). While, in its strictly etymological significance the word "advance" does not necessarily imply a loan, it has been so frequently used as its equivalent that it may be said that the word, whether taken according to its meaning in law or according to its meaning in common usage, includes loans as well as gifts. Eisenhardt v. Schmidt, 27 N.J. Super. 76, 98 A.2d 698 (1953). One of the meanings of "advance" is a loan; the word, when used in that sense, naturally importing a reimbursement, so as to imply the relation of debtor and creditor. Grone v. Economic Life Ins. Co., 80 A. 809 (Del. 1911).
As stated earlier, the GPCI response calls for a $200 million payment to the State which is to be repaid by the State, with interest at 7% per annum payable monthly during operation of the temporary casino and over the first 24 months of operation of the permanent casino from the State's share of monies due to gaming operations. This appears to be a debt.
In Laterriere v. Board of Levee Commissioners of Orleans Levee District, 182 La. 1060, 162 So. 773 (1935), our Supreme Court discussed the meaning of the word "debt" as follows:
 "Ordinarily, the word "debt" imports a sum of money arising on a contract, express or implied; but in its more general sense it means that which one person is bound to pay or perform for another.
 Thus a debt is `that which is due from one person to another, whether money, goods or services; that which one person is bound to pay to another, or to perform for his benefit; thing owed; an obligation or liability.' Vide `Debt,' Webster's New International Dictionary, Second Series (1935).
 `The word `debt', as defined by Burrill, is of large import, including not only debts of record or judgments and debts by specialty, but also obligations arising by simple contract to a very wide extent, and in its popular sense includes all that is due to a man under any form of obligation or promise.' Vide, Debt, Words and Phrases, First Series, vol. 2, p. 1865.
* * * *
 Thus it will be seen that included in the term `debt' is any obligation that one person is under to another to pay money or anything of value, which arises from the moment that the obligation is undertaken and which continues until it is discharged by performance."
Assuming that the District Court decision is not overturned and the Corporation is an instrumentality of the State, the Corporation would be subject to the limits for the incurrence of debt set forth in Article VII of the Constitution.
Article VII, Section 6 of the Louisiana Constitution sets forth the types of debt which the state, "directly or indirectly, or through any state board, agency, commission, or otherwise" may issue (emphasis added). Paragraphs 6(A) and (B) set forth the types of full faith and credit obligations which may be issued, which are limited to providing funds to repel invasion; suppress insurrection; provide relief from natural catastrophes; refund outstanding indebtedness or make capital improvements, none of which are applicable to GPCI's response to the RFP. Subsection 6(C) of Article VII grants additional authority to "any state board, agency, or commission authorized by law to issue bonds, in the manner so authorized . . . [to] issue bonds which are payable from fees, rates, rentals, tolls, charges, grants, or other receipts or income derived by or in connection with an undertaking, facility, project, or any combination thereof, without a pledge of the full faith and credit of the state." Paragraph 6(C) is not self-operative, state boards, agencies and commissions must be authorized by law to issue bonds.
The Act sets forth the authority of the Corporation in this respect at La. R.S. 4:621(6) which provides in pertinent part:
"The corporation . . . may:
 (6) Make, solicit, and bid requests for proposals and offers for major procurements, in accordance with law or rules and regulation of the corporation including:
* * * *
 (b) Contracts to incur debt in its own name and enter into financing agreements with the state, its own agencies, or with a commercial bank, excluding the authority to issue bonds."
This language specifically excludes the Corporation from the ability to issue bonds, as the Corporation is only authorized to enter contracts to incur debt for a "major procurement" which is defined to mean "the purchase or acquisition of any item, product, or service in the amount of one hundred thousand dollars or more." La. R.S. 4:605(22). While La. R.S. 4:610(B) grants to the Corporation all powers and faculties necessary to perform the functions for which it is created, this grant of power is subject to the limitation on the ability of the Corporation to issue debt set forth in La. R.S. 4:621(6)(c). Thus it does not appear that the debt which would be created under the GPCI response is authorized by Article VII, Section 6(C) of the Constitution nor even by the Act. Additionally, it is unclear as to whether under the GPCI response the State will receive the statutorily required minimum compensation.
PROPOSAL OF HJC
You also requested the opinion of this office on the response submitted by HJC which provides that HJC will make a $100 million initial payment to the state to secure the exclusive land based gaming license, subject to certain terms and conditions.
The pertinent terms and conditions of the HJC proposal state that a $100 million Letter of Credit or satisfactory security instrument will be placed in escrow 90 days after HJC receives a preliminary license and reaches a mutually acceptable licensing agreement with the state. The $100 million will be released to the state when: (i) a final state gaming license is issued for a temporary/permanent facility for a term of twenty years with a 10 year option to renew by the licensee and a temporary facility is opened by July 1, 1994; and (ii) no other land based or dockside casino is permitted in Orleans, Jefferson, St. Bernard, Plaquemines, St. Tammany, St. Charles or Tangipahoa Parishes.
The HJC response further provides that the $100 million will be returned to HJC if (i) the constitutional challenge to gaming is not favorably decided by December 31, 1993; (ii) land based or dockside casino is permitted in Orleans, Jefferson, St. Bernard, Plaquemines, St. Tammany, St. Charles or Tangipahoa Parishes; or (iii) HJC is unable to open either a permanent or temporary casino of at least 40,000 square feet by July 1, 1994, due to any delays beyond the control of the licensee.
The HJC proposal guarantees the annual gaming tax revenues to the state upon the opening of the permanent facility; however, the proposal is silent as to any payment of a percentage of gross revenues from net proceeds of the temporary casino. The HJC proposal contemplates a three phased opening of the casino based upon increased square footage, such that by March 1, 1995, 120,000 square feet of gaming is to be in operation. Although the proposal is unclear, it appears that the casino would be considered "temporary" until the total area of 120,000 square feet is open for casino gaming and the casino is considered "permanent". The HJC proposal further states that in the event land based or dockside gaming is authorized in Orleans, Jefferson, St. Bernard, Plaquemines, St. Tammany, St. Charles or Tangipahoa Parishes, HJC's would no longer be required to pay state gaming taxes.
The obligation to pay the $100 million is subject to a suspensive condition. "A conditional obligation is one dependent on an uncertain event. If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive." La. Civil Code art. 1767. Under HJC's proposal, payment is suspended until the following uncertain events occur: (i) HJC is awarded a final state gaming license to operate a temporary/permanent facility for a specified term; (ii) the facility is opened by July 1, 1994; and (iii) no other land based or dockside casinos are permitted in seven specified parishes.
Similarly, the Corporation's right to retain payment is subject to a resolutory condition. "If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory." La. Civil Code art. 1767. The right of the Corporation to retain the payment is contingent upon three "uncertain events": (i) the favorable resolution of the constitutional challenge to gaming in Louisiana by December 31, 1993; (ii) the opening of a casino facility by July 1. 1994; and (iii) the authorization of no land based or dockside gaming in seven specified parishes.
Both conditional obligations are dependant upon the non-occurrence of an event, namely the authorization of land based or dockside gaming in seven specified parishes. Allowing either conditional obligation to exist for any term would improperly penalize Louisiana $100 million for exercising its legislative prerogative to allow additional land based or dockside gaming.
It appears that although HJC may be obligated to release the $100 million, the Corporation's right to retain the $100 million will be subject to the resolutory condition indefinitely. Thus, the Corporation would only realize a right to the interest income produced by the $100 million while the condition is pending, and would not obtain unconditional ownership of the $100 million until it is certain that no other land based or dockside casinos will be authorized in the seven parishes. La. Civil Code art. 1773.
La. R.S. 4:641 provides the minimum conditions under which a contract is to be let and states in pertinent part as follows:
 C. The bid let by the board shall require a minimum compensation to be paid to the corporation of eighteen and one-half percent of gross revenues, or one hundred million dollars annually, whichever is greater. The bid shall allow an applicant to offer a proposal for compensation of a higher percentage of gross revenues, or a higher fixed dollar amount.
* * * *
 H. In the event that, at any time while the casino operating contract is in effect, through or as a result of the action or inaction of any or all, or any combination of the legislature, the state of Louisiana or any political subdivision or agency thereof, the corporation, any law enforcement entity or authority or persons, or any other entities, authorities, persons, firms, or corporations, one or more land-based casino gaming establishments in addition to the single casino gaming operation provided for by this Chapter is authorized to operate in the parish of the official gaming establishment, the casino operating contractors shall be relieved of the obligation to remit to the corporation the compensation required under the provisions of the Casino Gaming Operating Contract. For purposes of this Section, the conduction of gaming operations upon riverboats in accordance with the Louisiana Riverboat Economic Development and Gaming Control Act, video poker operations authorized pursuant to the Video Draw Poker Devices Control Law, authorized charitable gaming activities, lottery games conducted pursuant to the provisions of the Louisiana Lottery Corporation Law and pari-mutuel wagering as authorized by the provisions of Chapter 4 of Title 4 of the Louisiana Revised Statutes of 1950 shall not constitute the authorization of additional land-based casino gaming operations, which relieves the casino gaming operator of payment of compensation to the corporation.
* * * *
 J. The bid issued by the board and the proposal selected may authorize the casino operator having the winning proposal to conduct limited temporary gaming operations in the parish where the official gaming establishment is located, at a location designated by the casino operator and approved by the board. The conducting of such temporary gaming operation may be considered by the board in selecting a final proposal with compensation to the corporation and the state being not less than twenty-five percent of gross revenues with the remainder to the casino operator the net proceeds therefrom after deducting operating expenses to be utilized to perform and complete the obligations of the operator as contained in the casino operating contract and proposal. Temporary gaming operations shall cease upon the commencement of gaming operations at the official gaming establishment. (emphasis added)
La. R.S. 4:641(J) allows the Corporation to authorize a temporary facility, but also requires minimum compensation to the corporation and the state which must be paid while the temporary casino is operating. HJC'S proposal is silent as to compensation to be paid to the Corporation and the state while the temporary casino is operational.
The proposed $100 million lump sum payment might be viewed as an advance payment of the minimum compensation required under the Act; however, this payment does not satisfy the requirement of minimum compensation, because the payment is subject to a resolutory condition. Even assuming that the resolutory condition is subject to a specific term (presumably, the date by which HJC is fully operational, March 1, 1995), the proposal does not state the compensation required to be paid the State during the term of the temporary casino because the payment is subject to the conditions stated earlier. Assuming that the $100 million is not an advance payment of the minimum compensation, the proposal still fails to provide for the payment of the statutorily required minimum compensation.
Additionally, the Act, in unequivocal terms, states that gaming operations upon riverboats in Orleans Parish shall not relieve the casino gaming operator of payment of compensation to the Corporation. La. R.S. 4:461(H). The Act is equally clear in stating the casino operating contractor would be relieved of the obligation to remit the required compensation only if an additional land based casino is allowed to operate in Orleans Parish. Although HJC's proposal provides the minimum compensation allowed under the Act, the proposal also states that the "state gaming taxes" shall not be due and payable in the event land based or dockside casino gaming is allowed in the named parishes surrounding New Orleans. Therefore, this portion of the HJC proposal is not in accordance with the terms of the Act.
It is the opinion of this office that any agreement entered into by and between the Corporation and HJC based upon HJC's response to the RFP would violate the provisions of the Act in three important aspects: (i) the $100 million initial payment is subject to express conditions which are contrary to the provisions of the Act; (ii) the conditions which would require return of the $100 million are contrary to the provisions of the Act; and (iii) waiver of the statutorily mandated compensation is beyond the power of the Corporation.
The question remains as to whether or not the HJC proposal constitutes a debt. Because the payment to the Corporation is subject to the condition that it must be repaid in the event that certain events occur, all of which are outside of the control of the Corporation, it could definitely be argued that this proposal also constitutes a debt which is not authorized under the Act.
CONCLUSION
Based upon the foregoing, it is the opinion of this office that portions of the proposals submitted by both GPCI and HJC are violative of the Act and the Louisiana Constitution.
Trusting that this adequately responds to your request, I remain
Yours very truly,
 RICHARD P. IEYOUB Attorney General
RPI/MSH/NG